736 A.2d 1125

**Rose Mary FISHER, Mary Utley and Frank E. Scarpola**

v.

**STATE of Maryland.**

**No. 1394, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

Sept. 8, 1999.

82

84

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant, Utley.

Thomas J. Saunders, Assigned Public Defender, Baltimore, for appellant, Fisher.

Kreg Paul Greer, Assigned Public Defender, Bel Air, submitted on the brief, for appellant, Scarpola.

Ann N. Bosse, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Baltimore, and Sandra A. O'Connor, State's Atty. for Baltimore County, Towson, on brief), for appellee.

Argued before MURPHY, C.J., and MOYLAN and WENNER, JJ.

MOYLAN, Judge.

At 2:41 P.M. on June 25, 1997, nine-year-old Rita Fisher was pronounced dead at the Johns Hopkins Hospital. The subsequent post mortem report of the Office of the Chief Medical Examiner revealed that she had died of dehydration and malnutrition, conditions resulting from inadequate water and food intake. The post mortem report indicated that she had been admitted to the Johns Hopkins Hospital on June 25, the day of her death, and had "expired as a result of abuse and negligence."

Rita Fisher's physical development was described as "retarded." Her weight at the time of her death was forty-seven pounds, which was, in the opinion of the assistant medical examiner, considerably less than the average weight of a nine-year-old girl. Other medical records indicated that at an earlier period in her life she had weighed as much as 54–1/4 pounds. The evidence of physical abuse included "numerous recent and old abscesses and bruises to her head, chest, extremities, and buttocks." There were "multiple rib fractures exhibit[ing] a pattern of healing consistent with a severe chest injury several weeks prior to death." There was evidence of internal bleeding and of subdural bleeding of the brain. In addition, there were "multiple ligature marks on her wrists and ankles" which "indicate that she had recently been bound." There was also evidence that "a ligature [had been] placed recently around the chest."

On the next day, June 26, 1997, Rita Fisher's fifteen-year-old sister, Georgia Fisher, was admitted to the Northwest Hospital Center. Nurse Martha Chinery described Georgia, at the time of her admission, as "frightened, emaciated, malnourished, bruised, and scarred."

The appellants in this case were the three adult members of the household at 4106 Old Milford Mill Road in the Pikesville area of Baltimore County. Both Rita Fisher and Georgia Fisher had been members of that same household. The three appellants are 1) forty-nine-year-old Mary Utley, the head of that household and the mother of both Rita Fisher and Georgia Fisher; 2) twenty-year-old Rose Mary Fisher, daughter of Mary Utley and older sister of Rita and Georgia Fisher; and 3) twenty-one-year-old Frank E. Scarpola, Jr., the live-in boyfriend of Rose Mary Fisher.[1] The three appellants were jointly tried by a Baltimore County jury, presided over by Judge Dana M. Levitz, and convicted of a number of charges. All three appellants were convicted of:

1) The murder in the second degree of Rita Fisher;

2) The child abuse of Rita Fisher during the period of April 15, 1997 through June 23, 1997;

3) The child abuse of Rita Fisher on June 24 and June 25, 1997;

4) The child abuse of Georgia Fisher during the period of April 15, 1997 through June 23, 1997;

5) Conspiracy to commit child abuse on Rita Fisher; and

6) Conspiracy to commit child abuse on Georgia Fisher.

Rose Mary Fisher alone was additionally convicted of the child abuse of Georgia Fisher on June 24 and June 25, 1997.

Frank Scarpola received a combined sentence of ninety-five years' imprisonment; Mary Utley received a combined sentence of seventy-five years imprisonment; and Rose Mary Fisher received a combined sentence of thirty years imprisonment. All three appellants raise the following five joint contentions:

1) That Maryland does not recognize the offense of second-degree felony-murder predicated on the felony of child abuse;

---

1. The respective ages of the appellants are given as of June 25, 1997, the date of Rita Fisher's death.

2) That Judge Levitz erroneously failed to instruct the jury with respect to the necessary causal connection between the underlying felony and the death of the victim;

3) That Judge Levitz erroneously refused to compel disclosure to the defense of certain confidential and privileged records and in refusing to have the disputed records sealed and made a part of the record for this appeal;

4) That Judge Levitz erroneously refused to compel the State to reveal to the appellants the whereabouts of Georgia Fisher prior to trial and facilitate access to her on the part of the appellants; and

5) That Judge Levitz erroneously joined the appellants for trial.

Mary Utley alone raises three additional contentions:

6) That Judge Levitz erroneously admitted three out-of-court statements in violation of the rule against hearsay and the confrontation clause;

7) That Judge Levitz erroneously admitted evidence of misconduct on the part of Mary Utley for which she was not on trial; and

8) That Judge Levitz erroneously permitted counsel for Frank Scarpola to cross-examine Mary Utley as to whether other witnesses were lying or telling the truth and erroneously denied the resulting motion for a mistrial.

The appellant Rose Mary Fisher alone raises the additional contention:

9) That Judge Levitz erroneously refused to permit her to introduce expert testimony in her defense.

The appellant Frank Scarpola alone raises the additional contention:

10) That the evidence was not legally sufficient to support his convictions on the two conspiracy charges.

## The Factual Background

In the course of a ten-day trial, the State called fourteen witnesses, including one of the victims, Georgia Fisher. The defense called twenty-two witnesses, including the three appellants. The only undisputed facts were that prior to November of 1995, the residents of that address were Mary Utley, Rose Mary Fisher,[2] Georgia Fisher, and Rita Fisher. In November of 1995, Frank Scarpola moved into the residence as well.

The key witness for the prosecution was Georgia Fisher. Georgia related the abuse that she and her sister Rita had suffered at the hands of her mother, Mary Utley, for years before Scarpola moved in and the abuse that continued once Scarpola became a part of the household. With respect to the time period after Scarpola moved in, Georgia explained how she and Rita had to perform chores such as cleaning the house and looking after the pets and if those chores were not performed, "we would get a beating." When asked who, specifically, inflicted those beatings, Georgia answered, "Frank, Rosie and my mom." Georgia explained that the beatings would sometimes be with a yardstick and that sometimes the girls would be hit, kicked, or punched by the appellants. Scarpola would sometimes take Georgia and Rita into the basement and would use boxing gloves to hit them. When either of the girls fell down from being hit, Scarpola would order them to get back up so she could be hit again.

Georgia also described the many hours and days that she and Rita spent in "the hole." According to Georgia, "the hole" was "a small place [in the basement] that had a toilet and it had a stall and they locked us in there for punishment." Georgia explained that the "they" to whom she referred were "Frank, Rosie and my mom." The girls would be locked in "the hole" for "days at a time" with no light and only an occasional drink brought by the appellant Utley. When asked

---

2. As will be discussed herein, Rose Mary Fisher moved out of the residence for a brief period of time and resided with Frank Scarpola and his father.

how often the girls were fed while in "the hole," Georgia replied, "once in a blue moon." Neither Rita nor Georgia was permitted to go into the refrigerator for food. In fact, at one point a lock was placed on the refrigerator door to prevent just that.

Georgia testified that, pursuant to Scarpola's orders, she was not permitted to help Rita with her homework. On one occasion when she did so and was caught, Scarpola beat her over the head with a metal flashlight. The beating resulted in a "big gash." Scarpola then proceeded to shave Georgia's head, pour wine over the open wound, and sew the wound with a needle and thread. Georgia did not go to school for several days after the incident. Georgia also described for the jury an occasion, a few months before Rita died, when she had been tied to her bed, gagged, and blindfolded by Scarpola so that he could rape her.[3]

Georgia stated that she and Rita had been locked in their room for five consecutive days before Rita died. During those five days they were fed "sometimes" and permitted to use the bathroom once every other hour. At such times, one of the appellants would unlock the girls' bedroom door and accompany the girls into the bathroom. If either of the girls could not "perform" and use the toilet, she would be hit in the face. While in their bedroom, Rita was forced to sleep on the wooden floor because her mattress had been removed by Scarpola. Rita was required to sleep "with her arms straight up above her head and [with] her legs straight ... face up." Georgia was given the responsibility of seeing that Rita did not move from that particular position. If Rita did move, Georgia would be "held responsible for it" and would be beaten.

---

**3.** The charges relating to the sexual abuse of Georgia by Scarpola were severed from those that were a part of this trial because those charges related only to Scarpola. During the course of the trial, however, defense counsel made no objection to the questioning of Georgia about the rape.

Georgia testified that both she and Rita were kicked in the ribs by Scarpola the week prior to Rita's death. Scarpola then smashed or threw away the girls' toys, including a dollhouse to which Rita was very attached. Scarpola told Rita and Georgia that they would not need the toys any longer because the girls were going "to go someplace until they were twenty years old," *i.e.,* an institution.

The night before Rita died, Scarpola tied Rita up because she had been picking at a wound that Scarpola had earlier inflicted on her chin. Scarpola ordered Georgia to remove the shoestrings from her shoes. He then proceeded to tie Rita's hands to the dresser and her feet to the bed post with those shoestrings. Scarpola ordered Georgia to watch her sister. Georgia testified that during the course of that night and early the next morning, "[Rita] kept yelling [because she had to go to the bathroom] and Frank hit her and she couldn't be quiet so Frank taped her mouth shut." Georgia briefly untied her sister in the middle of the night to give Rita some relief, but then, fearing repercussions, she retied Rita after about an hour so that neither of the girls would be caught and punished.

Georgia then described what transpired on the morning of June 25. Rita "was blue, I banged on the doors because she kind of mumbled she wanted something to drink." Scarpola came into the room and struck Georgia. The other appellants then entered. They tried to give Rita a warm bath and they laid her on the floor on a blanket. Georgia then lay down beside her dying sister and "told her to hang in there," only to be pushed away by Utley. Georgia was then ordered by the appellants to "get dressed and to hurry up." She was ordered by all three appellants "to lie."

Dr. James Locke, the assistant medical examiner who performed the autopsy on Rita on June 26, 1997, catalogued the numerous signs of extensive physical abuse that Rita had suffered. Those injuries included: a bruise on the forehead with bleeding underneath the scalp; abrasions and bruises on the cheek and face; subdural bleeding of the brain; a ligature

mark on the chest; abrasions and scratches on the chest; scratches and bruising over the abdomen; a bruise over the left hip; bleeding in the chest cavity; fractures of four separate ribs with two of those ribs containing more than one fracture; bleeding internally within the abdomen; bruises and abrasions on both arms; ligature marks on both wrists; bruises and abrasions on both legs; ligature marks on the left ankle; a group of bruises along the mid-back; numerous abrasions in the back region; and numerous bruises to the buttocks. Dr. Locke also read to the jury the opinion portion of his autopsy report, wherein he wrote:

This nine-year-old white female, Rita Fisher, died of dehydration and malnutrition, conditions resulting from inadequate food and water intake. She had been admitted to Johns Hopkins Hospital on June 25th, 1997 and expired as a result of abuse and neglect. Her physical development was retarded, whereas, she weighed 47 pounds, approximately one-half of the average weight of a nine-year-old girl.

Evidence of physical abuse included numerous recent and old abrasions and bruises to her head, chest, extremities, and buttocks. Multiple rib fractures exhibited a pattern of healing consistent with a severe chest injury several weeks prior to death. Multiple ligature marks on her wrist and ankles indicated that she had recently been bound. There was also a ligature placed recently around the chest. Test for drugs and alcohol were negative. And no evidence of sexual abuse was seen. The manner of death is homicide.

Dr. Locke concluded that Rita Fisher was "deprived of food and water and physically abused."

Martha Chinery, a nurse at Northwest Hospital Center, testified that she admitted Georgia Fisher to the hospital on June 26, 1997 at approximately 11:30 p.m. Ms. Chinery described Georgia's physical and emotional condition on being admitted:

She was just a very scared, withdrawn little girl. Very emaciated. Painfully thin. Malnourished. Her hip bones were sticking out, just a mess.... There were bruises all

> over her body of varying age.... [W]e got her off the stretcher into the bed and she just kind of hovered in the fetal position.... She wouldn't talk unless spoken to.

Ms. Chinery testified about an occurrence on the evening June 27, when Frank Scarpola and Rose Mary Fisher came to visit Georgia at the hospital.

> Well, it was Mr. Scarpola and Rose Fisher. They had come, and I remember him saying, "don't give the nurses a hard time. Don't try and run away." Basically that was what they said.... He [Scarpola] also questioned me as [to whether] a pregnancy test been done.

Ms. Chinery also testified that Scarpola admitted to having locked Georgia and Rita in their room on prior occasions.

Numerous social workers, teachers, and administrators in the girls' respective schools testified for the State. Mary Friedman, an instructional assistant in Rita's class the spring before Rita died, testified that on January 7, 1997, Rita came to school with a bruise on her face. When questioned about the cause, Rita ultimately stated that "My mother hit me." School personnel notified the Department of Social Services of the abuse.

All three appellants testified in their own defense. Each, in essence, blamed the others for the crimes committed on the two girls.

Rose Mary Fisher testified that she had moved out of the residence at 4106 Old Milford Mill Road for a period of several months and that when she returned in November of 1995, she brought her boyfriend of approximately two years, Frank Scarpola, with her. She stated that when she and Scarpola first moved into the home, it was her mother, Mary Utley, who still had the responsibility for disciplining Georgia and Rita. Later, however, Scarpola took over the primary responsibility for disciplining the girls.

Rose Mary Fisher admitted to having inflicted a very limited amount of physical abuse on the girls, as well as to having locked them in their bedroom and in "the hole" on at least one occasion when Scarpola was out of town. Rose Mary

Fisher admitted that she had hit Georgia on the buttocks with a yardstick once because Georgia had stolen some money. She denied, however, ever having punched or kicked the two girls, ever having withheld food or water from them, ever having had any knowledge that the girls were being deprived of food and water, or ever having had an awareness of the multitude of bruises that were found on Rita's and Georgia's bodies on June 25 and June 26, 1997.

With respect to the night of June 24, the night before Rita died, Rose Mary Fisher testified that she and Frank went out to dinner to celebrate the third anniversary of their having begun to date and that, upon their return from a restaurant, she went upstairs and went directly to bed. She explained she had no knowledge that Frank had tied Rita up. The following morning, Rose Mary Fisher went into her sisters' bedroom and noticed that Rita's hands were tied to the dresser. She proceeded to cut the ties loose with a pair of scissors. At the direction of Scarpola, she helped him place Rita in a tub of warm water. Shortly thereafter, either Scarpola or Mary Utley told her to tell the authorities that Rita had fallen down the steps. The three appellants then proceeded to the hospital where Rita had been taken. Rose Mary Fisher denied every having had any intention to harm either Georgia or Rita.

With respect to her relationship with Scarpola, she testified that Scarpola made all of the decisions. She also stated that Scarpola had struck her on more than one occasion and that he had locked her in unspecified rooms in the house on more than one occasion.

Mary Utley, the mother, next testified. She laid much of the blame for the abuse committed on the girls on Scarpola. Utley testified that in early 1996 Scarpola "took control" over Rita's and Georgia's schedules, including the chores they were to do, their homework, and their discipline. According to Utley, Scarpola's punishments increased in harshness and, when Utley expressed her disagreement with such punishing, he responded by calling her an "unfit mother," "dumb," or "stupid." Scarpola would sometimes strike Utley. Utley also

detailed that as part of Scarpola's exercise of control over the entire household, he took the phone cord off the downstairs phone so that Utley could not use it, he locked Utley in her room, and he imposed a curfew on her. Utley denied ever having locked Rita or Georgia in "the hole," although she did acknowledge an awareness that the girls were being put down there. Utley testified that she did not intervene because she was "afraid of making things worse for them." Utley did contend that she took the girls food and water while they were in "the hole."

Mary Utley admitted that she realized that there were "problems in the home." She ultimately called the Department of Social Services. When asked why she had resorted to doing so, she explained:

> For the main fact that things were really out of control, it—Frank was totally in control. And there was no reasoning with him and [no] talking to him about anything. And the fact that he wanted to put the girls in an institution.

Utley met with a social worker, Tear Plater, at Utley's place of employment on June 24, 1997. She explained that, prior to the June 24 meeting with Tear Plater, "I couldn't do it at home because Frank made clear that if I went over his head that he would see to it that I was put into an institution and my house would be taken away." At that meeting between Utley and Ms. Plater, a home visit was scheduled for June 26. It never took place because Rita died the day before.

On the evening of June 24, Utley returned from work to find Rita and Georgia in their room, with Rita "sitting Indian style up against the bureau." Utley denied having any knowledge that Rita was tied up. Scarpola informed Utley that the girls "had just been repunished" for lying to him. After questioning the girls about why they had lied, Utley went downstairs to fix dinner for herself, Rita, and Georgia. She gave the food for the girls to Scarpola and she later received back two empty plates. She concluded that Rita and Georgia had eaten. Thereafter, she went to bed. The following morning when she awoke:

Frank unlocked my door and told me to go downstairs and call [Kennedy Krieger Institute] to say that Rita would not be in [presumably for an appointment], that she was still sick with the flu.

Utley complied. When she later went to the girls' bedroom, she noticed that Rita was "looking very bad." Utley testified that she intended to call the pediatrician to obtain help for Rita but "she died before I had a chance to." She then called 911. When questioned about that 911 call, she replied that she "told them that I found her at the bottom of the steps" because she had been "told to say that." She elaborated:

I told doctors and police [that Rita had fallen down the stairs], yes.... I was scared ... Frank had said that if we didn't tell the same story that we would all answer to him.

Utley then went to the Johns Hopkins Hospital where she was informed that Rita had died.

Utley also testified in some detail about Scarpola's exercise of control over the household. She explained that she never called the Department of Social Services or anyone for help because Scarpola had "made it very clear that if I would call or contact anyone that I would be put in a mental institution and my children would live with him and Rose." Scarpola would occasionally make the girls stand in a corner with their hands straight up in the air. When Utley objected, Scarpola would either hit her or call her an "unfit mother." During the days leading up to Rita's death, Utley admitted that she never checked on the girls to ensure their well-being. She explained that she failed to do so because "Frank would not allow anybody in the room but himself." Utley exonerated her daughter Rose Mary Fisher to a large extent. She testified that Scarpola did all of the punishing of Rita and Georgia and that Rose Mary only did so "when he demanded Rosie to do it."

Frank Scarpola was the last of the three appellants to testify. He stated that he moved into the Old Milford Mill Road home in November of 1995 and that at that time, the house "looked like a junkyard" and was a "complete wreck"

with "mice and roaches" throughout the house. He acknowledged having become involved in disciplining Rita and Georgia Fisher in the spring of 1996, approximately three months after he had moved in, largely because Mary Utley could not handle the two children on her own. Scarpola painted a picture of himself as the Good Samaritan, entering an already unstable and chaotic household for the purpose of trying to restore some kind of order. According to Scarpola, in early 1997 he contacted the Department of Social Services in an effort to get help for the family, and he further arranged for Rita to be seen at the Kennedy Krieger institute. Scarpola denied ever having hit the girls with boxing gloves or having punched them. He denied ever having hit Georgia over the head with a metal flashlight. According to Scarpola, Georgia made up the story as to how she received the injury. He did, however, admit to shaving her head, pouring alcohol over the wound and sewing it, because he thought he could take care of it himself without seeking medical attention. He insisted that he "loved [Rita] like she was my daughter" and that he would never do anything intentionally to harm either Rita or Georgia because he "cared about both of them too much."

Scarpola did, however, admit to having inflicted numerous punishments on both girls. He explained that when efforts at "normal punishments" failed, he would then resort to measures such as spanking with a belt or a paddle and "occasionally" smacking the girls. He admitted to placing a lock outside of the girls' bedroom to lock them in because he could not trust them any longer.

On the night before Rita's death, Scarpola admitted to having tied her to a dresser with shoestrings. According to Scarpola, Rita had fallen and hit her chin on the floor, causing her chin to bleed. Rita would not stop "picking at" the wound on her chin, so Scarpola tied her up to "stop her from hurting herself." Scarpola explained that he tied the strings very loosely. He insisted that it was Georgia who, after briefly untying her sister in the middle of the night to play with her for about an hour, had retied the strings too tightly. Scarpola denied having any knowledge that Rita was dehydrated or

malnourished. He further claimed that he only knew of a few bruises on Rita's buttocks and back. Scarpola added that it was Mary Utley's idea to lie to the authorities and tell them that Rita had fallen down the stairs.

## Second–Degree Felony Murder

All three appellants contend that they should not have been convicted of second-degree felony murder based on the underlying predicate felony of child abuse. They do not seem to question, as a more abstract generality, the fact that the residual common law felony murder doctrine, as an integral part of Maryland common law, is broader and embraces more potential predicate felonies than the limited number of more egregious, or at least more high profile, felonies chosen as first-degree aggravators by Art. 27, §§ 408, 409, and 410. The appellants' contention seems to be that the latter-day statutory felony of child abuse 1) was not a crime recognized by the common law and 2) is not inherently life-endangering and for either reason does not qualify as a predicate felony even in the broader arena of second-degree felony murder.

 Although we see no shred of merit in the contention, the subject is doctrinally fascinating and one on which this Court would happily discourse if it had the appropriate opportunity.[4] This appeal, however, does not present such an opportunity because of the utter failure of the appellants to raise such an argument before the trial court or to raise before us any alleged error with respect to it committed by

---

**4.** *See Jackson v. State,* 286 Md. 430, 435–36 n. 3, 408 A.2d 711 (1979); *Lindsay v. State,* 8 Md.App. 100, 104–05 nn. 6 & 7, 258 A.2d 760 (1969); *Evans v. State,* 28 Md.App. 640, 686 n. 23, 349 A.2d 300 (1975); *aff'd,* 278 Md. 197, 362 A.2d 629 (1976); *Warren v. State,* 29 Md.App. 560, 565–68, 350 A.2d 173 (1976); *Lamb v. State,* 93 Md.App. 422, 454–55, 613 A.2d 402 (1992); *Oates v. State,* 97 Md.App. 180, 186, 627 A.2d 555 (1993); *Brooks v. State,* 104 Md.App. 203, 223 n. 6, 655 A.2d 1311 (1995); *Harvey v. State,* 111 Md.App. 401, 408, 681 A.2d 628 (1996); Moreland, *Law of Homicide* (1952), 49; *And cf. Newton v. State,* 280 Md. 260, 268–69, 373 A.2d 262 (1977); *Stansbury v. State,* 218 Md. 255, 260, 146 A.2d 17 (1958); *Wood v. State,* 191 Md. 658, 666–67, 62 A.2d 576 (1948).

the trial judge even by way of omitting some *sua sponte* responsibility.

Even if the contention were properly before us, however, our resolution of it would be, at best, of only academic interest to Frank Scarpola. A single charge of second-degree murder was submitted to the jury with respect to each of the three appellants. On the verdict sheets, the jury indicated "guilty" with respect to each of the three. Under that verdict, however, the jurors were further permitted to indicate whether a second-degree guilty verdict had been based on any one or more of three possible rationales: 1) intentional killing, 2) depraved heart, or 3) felony murder. Mary Utley and Rose Mary Fisher were found guilty on the basis of only the felony murder rationale. Frank Scarpola, on the other hand, was found guilty on the basis of both the felony murder rationale and also the intentional killing rationale. Even if his conviction for second-degree murder, therefore, were found to have been flawed on the basis of the felony murder rationale, his conviction for murder in the second degree would still stand undisturbed on the basis of the self-sufficient intentional killing rationale.

The first failing of all three appellants with respect to this contention came at the trial itself. At no stage of the trial was this present argument even allusively raised, let alone preserved for appellate review. At the end of the State's case, all three appellants moved and argued for judgments of acquittal. The subject of second-degree felony murder did not come up. At the end of the entire case, all three appellants renewed their motions for judgments of acquittal. Again, the subject of felony murder was not raised by anyone. When the verdict sheets were submitted to the jury, no objection was lodged by any of the appellants on the basis of the inclusion of felony murder as a supporting rationale for a second-degree verdict. When the jury's verdicts were rendered, no objections in that regard were raised by anyone.

After Judge Levitz instructed the jury, Rose Mary Fisher objected to the instruction on second-degree felony murder,

but only on the express ground that it had not indicated that to be found guilty, a defendant must have participated in the particular phase of child abuse that caused the death of the victim. Mary Utley and Frank Scarpola joined in that contention and stressed the failure of the court to emphasize the necessary causative link between the death and the underlying felony. Following Judge Levitz's reinstruction, Rose Mary Fisher indicated her complete satisfaction with it. Mary Utley and Frank Scarpola renewed their earlier objections, but again those objections were couched only in terms of the proof of causation. It is not necessary to parse more finely these objections, however, for the appellants do not allege that Judge Levitz committed any error in instructing the jury on second-degree felony murder generally or on second-degree felony murder specifically predicated on the underlying felony of child abuse.

Without suggesting that we would be at all inclined to notice a non-preserved contention on the basis of some plain error notion, the short answer is that the appellants have not even raised the suggestion that we resort to plain error as a way of avoiding the non-preservation obstacle.

The appellant Utley alone makes the effort, post-trial, to avoid the preservation problem by pointing to her motion for a new trial. After the State, in its appellee's brief, argued that this second-degree felony murder contention had nowhere been preserved, Utley filed a reply brief in which she alleged that she had raised the issue in her motion for a new trial. She further argued in that reply brief that the opinion of this Court in *Jeffries v. State,* 113 Md.App. 322, 331, 688 A.2d 16 (1997), is authority for the proposition that the timely inclusion of a contention in a motion for new trial will preserve the contention for appellate review even if it had not been preserved in the course of the trial proper. *Jeffries* holds no such thing. We were not in that case discussing the issue of preserving particular arguments for appellate review. As a matter of logic, moreover, the inclusion of a contention in a motion for new trial might preserve it for review if we were reviewing whether the trial court had abused its discretion in

denying the motion for new trial. It would self-evidently not preserve the issue if we were reviewing the proceedings of the trial proper.

In any event, Scarpola did not even file a motion for a new trial. Rose Mary Fisher did, but she did not raise in that motion anything with respect to this issue. Neither did she argue anything with respect to this issue in the short, several-minutes-long hearing on the new trial motions before Judge Levitz. Whatever success in this regard Mary Utley may have will not rub off on them.

In her new trial motion, Mary Utley did list among her eight reasons the following:

4. Application of the felony-murder rule to the crime of Child Abuse is contrary to the law.

5. Application of the felony-murder rule to the crime of Child Abuse is unprecedented.

There was no follow-up memorandum of law elaborating on those claims. At the hearing on the new trial motions, her argument consisted exclusively of pointing out that the child abuse statute was enacted in 1963 and was never, therefore, a crime at common law. Judge Levitz denied both Utley's and Fisher's motions for new trial without comment.

The fatal flaw in this last-ditch effort by Mary Utley to eke out some semblance of preservation for appellate review is that she has not appealed from Judge Levitz's denial of her motion for a new trial nor claimed that he abused his discretion in that regard. For that reason alone, the contention is self-evidently not before us. Perhaps she was disinclined to appeal from that decision because of the words of Judge Digges in *Carlile v. Two Guys*, 264 Md. 475, 477–78, 287 A.2d 31 (1972):

There is probably no principle of law that rests on more decisions of this Court than the concept that a trial judge's granting or refusing a new trial—fully, partially, conditionally, or otherwise—is not reviewable on appeal except under the most extraordinary or compelling circumstances. *This is true even though the trial judge's decision is based on*

*mistake or erroneous conclusions of law or fact. Our adherence to this rule is unwavering* and we do not find any extraordinary or compelling circumstances in the present case which would permit a review. In fact, *this Court, in its long history, has never found such circumstances to exist.*

(Emphasis supplied). *See also Couser v. State,* 36 Md.App. 485, 495, 374 A.2d 399 (1977), *aff'd,* 282 Md. 125, 383 A.2d 389 (1978); *Burkett v. State,* 21 Md.App. 438, 446, 319 A.2d 845 (1974).

Non-preservation, however, turns out to be the least of the hobbles crippling this appellate contention. The overarching reason why it cannot succeed is that none of the appellants points to anything that might qualify as reversible error. On this contention, the appellate brief of Frank Scarpola simply adopts the contention as posed by Mary Utley. In combing both the Mary Utley and the Rose Mary Fisher briefs, we cannot find a single instance where they claim that Judge Levitz in the course of the trial committed any error with respect to this contention.

They do not allege that Judge Levitz ever made an erroneous ruling, ever erroneously failed to rule when called upon to do so, or ever failed to take some action *sua sponte* even in the absence of a request. They do not claim that, either on request or *sua sponte,* he erroneously failed to dismiss the second-degree murder charge or any supporting rationale for that charge. They do not claim that at the end of the State's case, he erroneously failed to grant their motions for a judgment of acquittal as to second-degree murder generally or as to the felony murder theory of second-degree murder. They do not claim that at the end of the entire case, he erroneously failed to grant their motions for a judgment of acquittal as to second-degree murder generally or as to the felony murder theory of second-degree murder. They do not claim that he erroneously instructed or reinstructed the jury on the theory of second-degree felony murder predicated on the underlying felony of child abuse. They do not claim that he erroneously presented to the jury a verdict sheet that permitted a finding

of guilty of second-degree murder on that theory. They do not claim that he erroneously accepted that verdict from the jury. They do not claim that he abused his discretion in denying the motions of two of the appellants for a new trial. They do not claim that he erroneously sentenced the appellants for their convictions for second-degree murder.

The appellants do not tell us what they ever asked Judge Levitz to do about second-degree felony murder which he failed to do. They do not even tell us what they now claim he should have done even absent any request from them. They overlook the most fundamental principle of appellate review, which is that the action of a trial court is presumed to have been correct and the burden of rebutting that presumption is on the party claiming error first to allege some error and then to persuade us that that error occurred. In this case, the appellants do not even allege error. In *DeLuca v. State,* 78 Md.App. 395, 397–98, 553 A.2d 730 (1989), we discussed this quintessential nature of the appellate process:

> We begin our analysis by restating one of the most fundamental tenets of appellate review: *Only a judge can commit error.* Lawyers do not commit error. Witnesses do not commit error. Jurors do not commit error. The Fates do not commit error. *Only the judge can commit error, either by failing to rule or by ruling erroneously when called upon, by counsel or occasionally by circumstances, to make a ruling.*

(Emphasis supplied). In *Ball v. State,* 57 Md.App. 338, 359, 470 A.2d 361 (1984), we elaborated on this same fundamental requirement of the appellate process:

> The very framing of this contention illustrates for the thousandth time the epidemic fuzziness of so much recent appellate rhetoric. "Error" is a precise term of art in the appellate context. No matter how reprehensible their conduct, trial attorneys, civil or criminal, for the State or for the defense, cannot, by definition, commit error; their conduct can do no more than serve as the predicate for possible judicial error. As Judge Powers carefully and thoughtfully

analyzed for this Court in *Braun v. Ford Motor Company,* 32 Md.App. 545, 548, 363 A.2d 562 (1976):

> *We know of no principle or practice under which a judgment of a trial court may be reversed or modified on appeal except for prejudicial error committed by the trial judge.* It is a misuse of language to label as error any act or failure to act by a party, an attorney, a witness, a juror, or by anyone else other than the judge. In other words, error in a trial court may be committed only by a judge, and only when he rules, or, in rare instances, fails to rule, on a question raised before him in the course of a trial, or in pre-trial or post-trial proceedings. *Appellate courts look only to the rulings made by a trial judge, or to his failure to act when action was required, to find reversible error.*

(Emphasis supplied).

■ The appellant Mary Utley, almost like a character out of a Greek tragedy standing on some windswept crag, raises the cosmic lamentation that she was "convicted of a non-existent crime." Quite aside from the fact that appellate review is not designed to deal with cosmic lamentations, she was not convicted of a non-existent crime. Even if, *arguendo,* child abuse could not serve as a predicate felony for second-degree felony murder, Mary Utley was still not convicted of a non-existent crime. She was convicted of murder and murder is not a non-existent crime.

In *Jeffries v. State,* 113 Md.App. 322, 688 A.2d 16 (1997), the appellant there also claimed to have been convicted of a non-existent crime and, indeed, had a far stronger argument in that regard than do the appellants here. Jeffries was convicted of first-degree felony murder where the predicate felony alleged in the indictment was carjacking. Carjacking had not been added to Art. 27, § 410, however, until one month after the murder in question and the amendment to the statute was not made retroactive. Although we addressed certain aspects of that contention in other regards that had properly been

raised, we dismissed Jeffries's claim that he had been convicted of "a non-existent crime" known as "carjacking-murder":

> The appellant . . . was not convicted of, let alone charged with, a non-existent crime. He has badly misidentified the crime in issue. *He was neither charged with nor convicted of some crime known as carjacking-murder. There is no such crime. The appellant was charged with and convicted of the crime of murder.* Murder, of course, was not only in existence as a crime on September 9, 1994, the day on which the appellant murdered Daniel Huston; it has been in existence as long as the Anglo–American common law itself. . . .
>
> That is the charging document in question and there is no mention of "carjacking" therein. *Murder was "the crime" with which the appellant was charged and of which he was convicted. . . .*
>
> Even so basic a division of murder as that which split it into two degrees for punishment purposes, ch. 138 of the Acts of 1809, did not turn murder into two separate crimes. *The crime, regardless of degree, remained simply murder.*
>
> *A fortiori,* even lesser distinctions among the various theories, rationales, or *mentes reae* that may support a conviction for either second-degree or first-degree murder do not create separate crimes. *The crime is still murder whether based, for instance, on a finding of an intent to commit grievous bodily harm or on a finding of a depraved heart. . . .*
>
> Within the more particularized realm of statutory felony-murder, the even more parochial distinctions among fifteen separate felonies and fifteen respective attempts (Art. 27, §§ 408, 409, 410) do not create thirty separate crimes. They represent nothing more than thirty different factual possibilities or modalities for committing felony-murder in the first degree.

113 Md.App. at 334–35, 688 A.2d 16 (citations omitted; emphasis supplied). Mary Utley's conviction for murder was not a conviction for a non-existent crime.

What the appellants with this contention are implicitly asking us to do is to bend and to stretch the rules of appellate review and to exercise extraordinary discretion to deal with what they deem to be an injustice crying out for redress. It is not even necessary to discuss whether we might be able to do so until the threshold is crossed of why we would wish to do so even if we could. The appellants ignore the distinction between due process and gratuitous process that we attempted to make clear in *Jeffries v. State*, 113 Md.App. at 325–26, 688 A.2d 16:

When due process demands, the law will reverse the conviction of an undisputed and cold-blooded killer even on a technicality *because it must*. A critical component of that principle, however, is the qualifying clause "because it must." It is not with any sense of satisfaction that a court reverses on a technicality. When it does so, it does so reluctantly and with heavy heart, and only *because it must*. The philosophical converse is that *when the procedural posture of an issue makes a reversal on a technicality a consequence that is not compelled but only gratuitously permitted, a court is frequently not motivated to be thus gratuitous.*

There is a vast philosophical, as well as legal, distinction between due process and gratuitous process. There are procedural requirements that must be satisfied before *process* literally becomes *due. For a reviewing court to overlook a precondition for review or to interpret loosely a procedural requirement, on the other hand, is an indulgence in favor of a defendant that is purely gratuitous.* Even those who are indisputably factually guilty are entitled to due process. By contrast, *only instances of truly outraged innocence call for the act of grace of extending gratuitous process.* This appeal is not a case of outraged innocence qualifying for an act of grace.

(Emphasis in original; emphasis supplied).

This was a bad case, one resulting in the tragic death of a nine-year-old girl and the equally tragic psychological scarring of a fifteen-year-old girl. The criminal agency of the three

appellants is not in dispute. They were unquestionably to blame for the barbaric treatment of two little girls who were deserving of their protection. Under the circumstances, this is not a case of "outraged innocence qualifying for an act of grace."

### Second–Degree Felony Murder
### Jury Instruction on Causation

All three appellants contend that Judge Levitz, in instructing the jury on the subject of felony murder, erroneously failed to explain adequately the necessary causal connection between the perpetration of the underlying felony and the resultant homicide.

In the course of explaining to the jury the various crimes with which all three appellants were charged, Judge Levitz informed the jurors that the three defendants were "charged with homicide." He then explained that that overall charge included "murder in the first degree, murder in the second degree and involuntary manslaughter." He proceeded to give brief explanations of all three degrees of criminal homicide.

With respect to murder in the second degree, moreover, he further explained that "[t]here are three types of second degree murder." He first instructed the jury as to 1) second-degree murder of the specific intent to kill variety, then 2) second-degree murder of the depraved heart variety, and finally 3) second-degree murder of the felony murder variety:

The third type of second-degree murder is referred to as second degree felony murder. In order to convict a defendant of this type of second degree murder the State must prove one, that the defendant committed a child abuse. Two, that the defendant or another participating in the crime killed Rita Fisher. And three, that the act resulting in the death of Rita Fisher occurred during the commission of a child abuse. In this type of second degree murder the State is not required to prove that the defendant intended to kill the victim.

But for the substitution of "second degree" for "first degree," that instruction followed, word for word, Maryland Pattern Jury Instruction—Criminal 4:17.7 for first-degree felony murder. The Pattern Jury Instruction, in turn, follows precisely from Art. 27, Sects. 408, 409 and 410, which provide, "All murder which shall be committed *in the perpetration of* [a particular felony] ... shall be murder in the first degree." (Emphasis supplied).

After describing the various crimes with which the appellants were charged, Judge Levitz then explained generally the degree of complicity or level of participation that a defendant must have had to be found guilty of a crime:

> In this case the defendants are charged with the crimes of homicide and child abuse. A person who aids and abets in the commission of a crime is as guilty as the actual perpetrator, even though he or she did not personally commit each of the acts that constitutes the crime. A person aids and abets the commission of a crime by knowingly associating with the criminal venture, with the intent to help commit the crime, being present when the crime is committed and seeking by some act to make the crime succeed.

> In order to prove that a defendant aided and abetted the commission of a crime the State must prove one, that a defendant was present when the crime was committed. And two, that a defendant wilfully participated with the intent to make the crime succeed. Presence means being at the scene or close enough to render assistance to the other perpetrators. Wilful participation means voluntary and intentional participation in the criminal act.

> Some conduct by a defendant in furtherance of the crime is necessary.

We would have no problem with the adequacy of that instruction as to the necessary causative link between the underlying felony of child abuse and the resultant death of Rita Fisher. Judge Levitz's statement that the jury must find that "the act resulting in the death of Rita Fisher occurred during the commission of a child abuse" follows verbatim

MPJI–Cr. 4:17.7's language that "the act resulting in the death of [the victim] occurred during the commission of [the underlying felony]." They both parallel the statutory requirement of first-degree felony murder that the killing "be committed in the perpetration of [the underlying felony]."

■ Both at that point in the instructional process and again following the reinstruction, Frank Scarpola alone expressly objected to the adequacy of the instruction on the issue of causation. We hold that the instruction was adequate. It is highly dubious whether the objection made by Mary Utley at the end of the initial instructions went to anything except the giving of a felony murder instruction generally. To the extent to which some objection by her on the issue of causation can be inferred, however, our rejection of the contention is the same as in the case of Frank Scarpola.

What Scarpola, and perhaps Utley, sought to do was to obtain a jury instruction that would limit the cause of death to some highly particularized constituent element of child abuse, thereby negating any causative link between Rita's death and all other aspects of the child abuse totality. They wanted to carry out the causation to the last possible decimal point. The child abuse in this case, however, cannot be so finely parsed or endlessly fragmented into a series of discrete and unconnected acts. The course of abuse was an ongoing and cumulative "whole" over a period of many months for which all of the appellants were jointly responsible.

The medical examiner gave as the ultimate cause of death "malnutrition and dehydration." To be sure, he did then testify that as between those two contributing causes, dehydration would literally take effect first, killing the victim before the malnutrition would be lethal. There is no solace to be found there, however, permitting one codefendant to claim that her depriving Rita of food could not be a cause of death because the last-second *coup de grace* had actually been a codefendant's depriving Rita of water. *De Vaughn v. State*, 232 Md. 447, 455–56, 194 A.2d 109 (1963); *Palmer v. State*, 223 Md. 341, 353, 164 A.2d 467 (1960); *Duren v. State*, 203 Md.

584, 593–94, 102 A.2d 277 (1954); *Blackwell v. State,* 34 Md.App. 547, 558–59 n. 3, 369 A.2d 153 (1977); *Tipton v. State,* 39 Md.App. 578, 588, 387 A.2d 628 (1978).

Even focusing narrowly on dehydration itself, moreover, Rita's dehydration was a continuing and cumulative condition, not the unique deprivation of the last possible drink of water for which a single codefendant bore exclusive responsibility, exculpating all prior deprivers of blame. On the basis of the electrolyte changes in Rita's body, Dr. Locke concluded that the dehydration that was the cause of death was not an "acute" or sudden dehydration but a "chronic dehydration," a "process that takes days or, if not longer, weeks." He described her dehydration as "severe," resulting in the loss of "approximately 15% of her body water." That long-term dehydration was clearly the result of having been locked in the bedroom without food or water on multiple occasions and of having been locked in the "hole" for days at a time without food or water on multiple occasions. It was as a result of an ongoing pattern of child abuse in which all of the appellants had participated.

At the end of the initial instruction, however, Rose Mary Fisher, because of the State's charging pattern, did have a technical point which Judge Levitz acknowledged could have merit. The State had charged all three appellants with two distinct periods of child abuse: one from April 15 through June 23 and the other on June 24 and June 25 specifically. Rose Mary Fisher's argument was that 1) if she were found guilty of the first period of child abuse but not guilty of the second and 2) if the death of Rita were found to have been only as a result of the second period of child abuse, the initial instruction might have permitted her, Rose Mary Fisher, to be convicted of felony murder predicated on a felony she had not committed.[5]

---

5. She was convicted on both charges of child abuse, so her point, even if then valid, is now moot.

Judge Levitz accordingly reinstructed the jury, adding a critical clause to make certain that a defendant must be guilty not only of some act of child abuse but of that particular phase of child abuse charged as the underlying predicate felony.

I want to again give you the definition of felony, second degree murder, *because I left out a phrase* that I think counsel has brought to my attention *that I think is important.* So this is the definition of felony second degree murder, the type of second degree murder.

In order to convict the defendant of this type of second degree murder the State must prove one, that the defendant committed a child abuse. Two, that the defendant or another participating in the crime killed Rita Fisher. And three, that the act resulting in the death of Rita Fisher occurred during the commission of child abuse *and that the defendant participated in that child abuse.*

(Emphasis supplied).

That reinstruction fully satisfied Rose Mary Fisher and she made no further objection. Neither did Mary Utley make further complaint, except to renew her objection to the giving of any second-degree felony murder charge at all. Frank Scarpola simply renewed his earlier objection on the subject of causation generally. Even if preserved, on the issue of jury instructions or reinstructions, we see no error.

### Non–Disclosure
### of Confidential and Privileged Records

All three appellants make the free-wheeling and undifferentiated charge that Judge Levitz erroneously "refus[ed] to compel disclosure to the defense [of] confidential and privileged records." Although we will attempt to answer what we deem to be the most significant sub-aspect of this amorphous charge on its apparent merits, our more summary rejection of large parts of the contention follows from its unfocused nature. This contention could easily have been dismissed without serious consideration because of its lack of specificity.

To answer this omnibus complaint in meaningful detail, we would have to do for the appellants what they have not done for themselves. We would have to isolate a dozen distinct subclaims controlled by various statutory provisions and legal principles, something the appellants have not done. Although the appellants do not tell us this, the disclosure of confidential information from the Baltimore County Department of Social Services, for instance, is governed by Art. 88A (Department of Human Resources), Sect. 6A, whereas the disclosure of confidential information from the Baltimore County Board of Education is governed by the Code of Maryland Regulations (COMAR) 13A.08.02.20A. Presumably other statutory provisions control the disclosure of confidential information from other agencies involved in this contention, but the appellants have been content to lump them all together without any statutory citation. We would have to make a distinct legal argument pertinent to each subclaim, referring to the apposite statutory provision, something the appellants have not done. We would ultimately have to answer the distinct arguments that we had concluded the appellants would like to have made. For their part, the appellants have simply thrown generous handfulls of subissues against the wall, hoping that something will stick.

They do not differentiate, for instance, their entitlement to **review** records as part of eleventh-hour discovery from their entitlement to **introduce** the records into evidence at trial. Their contention deals expressly with the former although the key ruling to which they object at least implicates the latter. They do not differentiate the privacy interest in "a student's education records" from that in "a state's child abuse information." *Zaal v. State,* 326 Md. 54, 76, 602 A.2d 1247 (1992) ("There is not the same degree of urgency to limit access to the education records of students as is true in the case of maintaining child abuse information confidential.") Most significantly, they do not differentiate the breaching of **confidentiality** from the breaching of a **privilege.** *Reynolds v. State,* 98 Md.App. 348, 368, 633 A.2d 455 (1993) ("These records are confidential and the patient has a right to privacy with respect

to them, but they should not be kept from defense counsel under the theory that they are privileged.")

■ We have not even alluded to the problem of trying to figure out, without a scorecard, which appellants summoned which records and which appellants did not even issue subpoenas the quashing of which they now challenge. An appellant may not deftly dodge a preservation problem by adopting an appellate contention of a codefendant who has no preservation problem. There seems to be an unstated assumption that everything applies to everybody. In essence, what we have been presented with on this contention is a case of undifferentiated angst. Because of the importance of the case, however, we will make an effort to compartmentalize this amorphous mass and then look at it, compartment by compartment.

### A. *Confidentiality of Agency Records:*

Initially before Judge Levitz on March 19, 1998, was a defense motion that he issue a subpoena *duces tecum* for

documents and tangible evidence [of] various records, custodian of records of Kennedy Krieger Institute, for all records pertaining to the treatment rendered to Rita Fisher; custodian of the records of Baltimore County Board of Education for any and all school records; ARD team notice; student health records and records from Chatsworth School for Rita Fisher, also for Georgia Fisher, also for Rose Mary Fisher and Robin Utley Fisher, now Robin Longest; custodian of the records for the Baltimore County Department of Social Services, for all records in case files as it pertains to Rita Fisher, Georgia Fisher, Rose Mary Fisher and Robin Utley Fisher; Doctor Alvin Stambler, the medical records of Rita Fisher; Dutch Ruppersberger, Baltimore County Executive, all investigative records and files as it relates to the Baltimore County Executive's investigation into Social Services as it pertains to the death of Rita Denise Fisher and other children in that household; And Mark Vidor, Assistant Director of Family Services, all files relating to the

Fisher/Utley family; as well as investigative reports that have been written after the death of Rita Denise Fisher.

With respect to requests for subpoenas, Judge Levitz explained that it is not the trial judge's responsibility to issue a subpoena *duces tecum* in the first instance. It is the job of the defendant to request the clerk of the court to issue subpoenas. If the agency on which the subpoena is served then elects to assert the confidentiality of the records as a reason not to respond to the subpoena, that agency must file an objection with the court and a representative from it may have an opportunity to be heard.

That procedure was followed. When the next pre-trial hearing convened on March 27, 1998, representatives from four Baltimore County agencies were present to move that the respective subpoenas *duces tecum* served on them be quashed. The agencies were the Board of Education, the Department of Social Services, the Office of the County Executive, and the Health Department (Division of Developmental Disability).

Bruce Mermelstein responded for the Department of Social Services and, uniquely among the responding representatives, relied on Maryland Code, Art. 88A, Sect. 6, which provides for "Social Services records being confidential." None of the appellants has, in appellate brief or argument, even referred to Art. 88A, Sect. 6, let alone informed the Court of what it says. They have not argued as to whether it precludes disclosure or not. It is not the job of this Court to search out reasons why Judge Levitz may have been correct in a particular ruling. His ruling is presumed to have been correct, and the burden is on the appellants to persuade us that the presumptively correct ruling was in error. On this subissue, the appellants demonstrably have not so persuaded us and we will look no further at anything concerning the records of the Department of Social Services.

We do note, however, that at the March 27 hearing, Judge Levitz deferred action on the motion to quash that particular subpoena. On April 6, however, he ruled that the Department of Social Services would not be required to divulge any of its

records except for one document that was released to Rose Mary Fisher, because a single sentence on a single page could have been exculpatory as to her. As far as individual social workers themselves were concerned, there was no impediment to their being called as trial witnesses, and, indeed, five of them were called and testified for the defense. In terms of those witnesses referring to notes or records, moreover, there was no limitation imposed on their direct or cross-examinations. With respect to any records of the Department of Social Services, therefore, there is no suggestion as to what possible prejudice may have been suffered by any of the appellants. We see no error with respect to this subcontention.

As Robert Haines responded for the Board of Education, most of the controversy with respect to the confidentiality of its records dropped out of the case. In the course of his testimony at the hearing, it became apparent that there was much confusion in the defense ranks as to the scope of the motions to quash the subpoenas. It became clear that the defense attorneys were primarily apprehensive about their entitlement at trial to call various teachers and social workers who had been involved with different members of the Fisher family. The defense erroneously assumed that the quashing of a subpoena *duces tecum* for the respective agency's records would preclude the defense from calling teachers and the social workers as trial witnesses. Judge Levitz assured counsel that whatever was decided with respect to the production of records had nothing to do with their right to call live witnesses. In fact, at trial the appellants did call numerous teachers and social workers as defense witnesses and were in no way impeded in that effort.

Robert Haines further reduced the area of the controversy. He indicated that although the subpoena to the Board of Education called for all school records, ARD notes, health records and reports from Chatsworth School concerning four members of the family, and ARD team meeting notes, the Board was not contesting the subpoena with respect to any of those items. It was only challenging the order to produce the

psychotherapy records of Georgia Fisher. Nothing but the reports of the interviewing psychiatrists or psychologists was sought to be protected as privileged.[6] The controversy with respect to the Board of Education was thus reduced from one involving both agency confidentiality and privilege to one involving only the issue of privilege.

Because the motion to quash filed by the Board of Education dealt only with psychotherapy records, Judge Levitz, on March 27, ruled that the divulgence of those particular records involved not the issue of confidentiality but the issue of privilege and, on that basis, he quashed the subpoena. The merits of that ruling will be discussed *infra* when we turn to a consideration of the issue of privilege.

The third agency involved in the hearing to quash the subpoenas was the Baltimore County Health Department, Division of Developmental Disability, as the apparent umbrella agency for a group called the Cerebral Palsy Children. Rita Fisher had once been evaluated by the Cerebral Palsy Children. Mary Utley argued that Dr. Alvin Stambler, a pediatrician, would probably be called as a witness by the State and that part of Dr. Stambler's diagnosis would probably be based on a report received by him from the Cerebral Palsy Children. She felt she would need the report for effective cross-examination. The apparent subject matter of the evaluation and the report was a congenital hip condition suffered by Rita. At the March 27 hearing, Judge Levitz deferred action on that particular motion to quash the subpoena. On April 6, however, he ruled that the Division of Developmental Disability was not required to divulge to the defense any of its records.

Subsequent events revealed that there was no conceivable prejudice suffered by the appellants as a result of that particular ruling. The State never called Dr. Stambler as a witness. Co-defendant Frank Scarpola did. Dr. Stambler was Rita's

---

6. Although the motion to quash had originally covered the psychotherapy records of Rose Mary Fisher as well, once she announced that she was waiving her privilege, those records were immediately released to her.

pediatrician from June of 1993 until the time of her death. He mentioned the preexisting hip condition and indicated that his records showed that Rita "had been seen by not only one orthopedist, but I think a consulting orthopedist who diagnosed her hip as femoral anti-version." That report from the consulting orthopedist was presumably the report from the Cerebral Palsy Children. Dr. Stambler explained what a "femoral anti-version" is and further indicated that it was a condition that one would not attempt to correct "until many years had passed." He went on to describe other and more relevant observations he had made of Rita.

Counsel for Mary Utley briefly cross-examined Dr. Stambler and was not in any way impeded in the scope of her cross-examination. The only arguable reference to a report from the Cerebral Palsy Children was the following:

Mr. Nugent: Doctor, did you have the opportunity to speak with Dr. Parker or did you receive any records from him?

A: I received some records.

Q: Okay.

Mary Utley seemed satisfied and pursued it no further. At this point we cannot imagine what possible prejudice Mary Utley, or either of the other appellants, are suggesting might have flowed from the ruling that the Division of Developmental Disability need not divulge any of its records to the defense. The appellants suggest none. As to this subcontention, we see no error.

■ With respect to the fourth and final subpoena *duces tecum*, the representative of the Office of County Attorney had nothing to say at the hearing and none of the appellants said anything with respect to records subpoenaed from that office. At the March 27 hearing, that subpoena was quashed by Judge Levitz. On this appeal the appellants have said nothing with respect to any such records or to any prejudice suffered because of the lack of such records. For lack of argument, that subcontention languishes. We see no error.

To the extent that the appellants are now claiming some right of discovery in order to review anything except the

privileged psychotherapy records of Georgia Fisher, it must be noted that the appellants actually were furnished with virtually, if not literally, everything they are now claiming they were denied. At the hearing on March 19, 1998, Assistant State's Attorney James Gentry informed the court that almost all of the records that were the subject matter of the later subpoenas *duces tecum* had already been voluntarily turned over by the State to the defense.

> [W]e do have records that have been supplied to the defense. They are the records from the Department of Social Services relating to all of the investigation of the Fisher/Utley household. We have Rita and Georgia's school records. We have supplied that to them. We have their health records. We have supplied that to them. We have the records from Georgia, Doctor Stambler, the pediatrician. We have supplied that to them.
>
> We have the records from the Johns Hopkins Hospital. We have supplied that to them. From Northwest Hospital, we have supplied that to them. We have the records from the other schools that Georgia attended. Her school records and health records we have supplied that to them. . . .
> [W]e gave them everything leading up to the 25th of June.

Judge Levitz had the State clarify and reiterate that revelation and it was clear that the voluntary disclosure by the State included everything in dispute except the psychotherapy records relating to Georgia Fisher that were generated after June 25, 1997, the day Rita Fisher died.

> The Court: Are you stating here for the record that all of the records that you have obtained from anybody who's treated Georgia Fisher you've given to the Defense?
>
> [Prosecutor]: Everything, every record, every record that we have pertaining to Rita and Georgia, be it school records, therapy notes, DSA reports, Child Protective Services records, everything, every piece of paper we have has been given to the defense. Everything. And numbered for them so there is no dispute later on. So they've gotten our entire five volumes of information.

At the subsequent hearing on March 27, Assistant State's Attorney Ann Brobst reconfirmed that the defense team had had full disclosure.

Ms. Brobst: All records which were subpoenaed by my office during the investigation were provided to defense counsel. They were numbered and sent out after the court signed a protective order limiting their disbursal beyond that to the immediate counsel.

The Court: So are you relating that all records that you received have been given to the defense under seal?

Ms. Brobst: Subject to your protective order, that's correct, Your Honor.

Despite all of the forensic thunder, therefore, there really does not appear, on close examination, to be anything in dispute except the psychotherapy records relating to Georgia Fisher after June 25, 1997. Mary Utley's brief, indeed, acknowledges, "The State asserted that it had already disclosed to the defense all records up to June 25, 1997; the bone of contention was records generated thereafter." The Scarpola brief piggybacked on the Utley brief and presumably agrees.

Notwithstanding the fact that most of the agency records in issue had already been furnished to the defense by the State, the appellants' contention is framed not in terms of **introducing at trial** otherwise confidential records but exclusively in terms of **reviewing** a mass of records in the hope of finding usable material therein. Contention IV in Utley's brief is labeled "THE TRIAL COURT ERRED IN *REFUSING TO COMPEL DISCLOSURE* TO THE DEFENSE OF CONFIDENTIAL AND PRIVILEGED RECORDS." (Emphasis supplied). This contention begins, "A recurring issue in this case was the entitlement of the defense **to review** confidential and/or privileged documents compiled by various government entities ..." (Utley brief at 27)(emphasis supplied). "The trial court erred both in refusing to permit at least counsel for appellant **to review** the records ..." (*Id.* at 30)(emphasis supplied). "While these cases confer no automatic right to disclosure, they do recognize that under certain circumstances

**the needs of the defendant in preparing for trial** may outweigh the confidentiality or privacy interest of the alleged victim." (*Id.* at 30)(emphasis supplied). "Under these circumstances, **permitting review by counsel** in conjunction with a protective order limiting further disclosure was the minimally necessary relief consistent with guaranteeing a fair trial." (*Id.* at 31)(emphasis supplied). The Scarpola brief on this contention simply adopted the Utley brief. The Rose Mary Fisher brief is essentially a copy of the Utley brief.

■ *Goldsmith v. State,* 337 Md. 112, 127, 651 A.2d 866 (1995), before reaching the subject of more sacrosanct privileged records, discussed the limited access available to even "merely confidential" records.

> Even if the records in the instant case were not privileged, but were merely confidential, we would nonetheless hold that the motions judge did not abuse his discretion in declining to issue the pre-trial subpoena and declining an *in camera* review of those records.

It is the defendant who bears the burden of showing not only a possibility but a **likelihood** that a review of confidential records will reveal relevant information.

> [T]o overcome a privacy interest in ... records, some relationship must be shown between the charges, the information sought, and the likelihood that relevant information will be obtained as a result of reviewing the records. Thus, to obtain pre-trial discovery of confidential records, *Zaal* and *Harris* require the defendant to show a likelihood of obtaining relevant information.

337 Md. at 128, 651 A.2d 866 (citations omitted).

■ Most significantly for the present case, a mere assertion that the credibility of a witness is an issue and that "some latitude" is necessary in looking for impeaching material is not enough to cross the threshold.

> [I]t is the defendant who bears the burden of establishing the need for pre-trial disclosure. In the instant case, Goldsmith did not establish a need for the records. *Goldsmith*

*asserted only that Laura's credibility would be an issue at trial.* He did not establish that discovery of the records would likely lead to relevant information. Rather, *he sought "some latitude in obtaining information that may enable him to confront his accuser in some meaningful way."* There was no showing of any likelihood of obtaining information relevant to the defense in the records.

*Id.* (citations omitted; emphasis supplied). The threshold showing by the appellants in this case was no stronger than the showing held to have been inadequate in *Goldsmith.* There was not enough to compel an *in camera* review even by Judge Levitz alone.

Notwithstanding the failure of the appellants to cross that threshold, even with respect to the confidential reports of the Department of Social Services and the Division of Developmental Disability, Judge Levitz nonetheless conducted an *in camera* review of all of the records in question. In open court on April 6, he ruled:

I have, for the record, spent a number of hours last week reviewing all of the records that were submitted to me for review in camera. From the Developmental Disabilities Agency, from the Department of Social Services, which I believe also included the records from Sheppard Pratt, as we discussed at a previous hearing in regard to my review for exculpatory information.

After reviewing those records, which were literally hundreds of pages, I have determined that there was nothing exculpatory in the Developmental Disability records.

There is, quite frankly, one page of the Department of Social Service records which I believe under the case law could be exculpatory, and I intend this morning to release that document to counsel for Miss Fisher, because that's who it involves. It doesn't involve anybody else, the exculpatory nature of it. I intend to give that to you this morning, as well as a copy to the State. Other than that one page, which is really, it comes down to, one sentence,

there was nothing else in the records that was exculpatory in my view. And so those records will not be divulged.

As an alternative and independent rationale, we would rely on that *in camera* review as a basis for affirming Judge Levitz's decision not to breach the confidentiality of the records in question.[7]

### B. *The Psychotherapist–Patient Privilege of Georgia Fisher:*

What the appellants were really concerned about were the psychotherapy records concerning Georgia Fisher. Almost all of their argument concerned the possible discovery of material that might be helpful to impeach her credibility by showing prior inconsistent statements, to show bias or motive on her part, and to question her competence as a witness to perceive and to narrate events. All of the static about other records is little more than appellate opportunism.

When it comes to the reports of psychiatrists and psychologists, and their attendants, about the observation, interviewing, diagnosis, and treatment of Georgia Fisher, we move onto a higher and more sacrosanct plane of informational protec-

---

7. Our reason for relegating this rationale for affirmance to an alternative and secondary holding is because we harbor some concern about the failure of the trial court to have sealed the records that were reviewed and to have made them available for our review. In *Zaal v. State*, 326 Md. 54, 88 n. 15, 602 A.2d 1247 (1992), it was said, "The trial judge should mark and seal the records excluded so that the judge's determination in that regard may be reviewed on appeal." In *Reynolds v. State*, 98 Md.App. 348, 369, 633 A.2d 455 (1993), it was said, "The records that are reviewed but 'are not even arguably relevant and usable' should also be sealed, but filed separately from the records that are not reviewed." Although the statements from *Zaal* and *Reynolds* were, to be sure, *dicta*, it is prudent not to ignore *dicta* from two chief judges.

Even were this rationale the exclusive one for affirmance and even were the failure to seal the records deemed to be critical, however, a reversal of the judgments of conviction would not be mandated. At most, and without even considering the possibility of harmless error, what would be involved would be a limited remand for the purpose of having the records collected and forwarded to us for our *de novo* appraisal.

tion. We confront the psychotherapist-patient privilege. Md. Code (1998 Repl.Vol.), Cts. & Jud. Proc. Art., § 9–109(b), provides:

> Unless otherwise provided, *in all judicial,* legislative, or administrative *proceedings, a patient or his authorized representative has a privilege* to refuse to disclose, and *to prevent a witness from disclosing, communications relating to diagnosis or treatment of the patient's mental or emotional disorder.*

(Emphasis supplied).

On March 23, 1998, Judge Levitz appointed Sandra Thornhill Brushart, Esquire, of the Baltimore County bar, to represent Georgia Fisher, to inform her of her psychotherapist-patient privilege, to ascertain her wishes with respect thereto, and to report those wishes to the court. *See Nagle v. Hooks,* 296 Md. 123, 125–28, 460 A.2d 49 (1983). On March 27, Ms. Brushart, as Georgia's authorized representative, was present in court and reported as follows:

> I did have an opportunity on Wednesday to meet with Georgia. And I did fax a letter to Your Honor stating that I had met with Miss Fisher and *she does wish to assert her privilege* not to have any of her records revealed, both mental, health, psychological, educational, Social Service records, anything, any of her records, she does not want them to be disclosed to this court.

(Emphasis supplied).

In *Reynolds v. State,* 98 Md.App. 348, 367, 633 A.2d 455 (1993), Judge (now Chief Judge) Murphy pointed out that with respect to privileged, as opposed to merely confidential, information there is a threshold that must be crossed before it is even appropriate for the trial judge to review such records *in camera:*

> We call for a procedure that separates information protected by C.J. 9–109 into three categories: (1) *information*

*that is not reviewed by the trial judge because there has
been no preliminary showing of necessity for a review.*
(Emphasis supplied).

Judge Murphy went on to point out that it is the defendant
who bears that burden of showing the necessity for a review.
He also described the required substantive content of such a
showing:

> *The defendant bears the burden of demonstrating the
> need for inspection* of records containing information that is
> privileged under C.J. § 9–109. The appropriate degree of
> persuasion is identical to the burden that must be shoul-
> dered by the defendant seeking a new trial on the basis of
> newly discovered evidence. That burden is found in *Yorke
> v. State,* 315 Md. 578, 588, 556 A.2d 230 (1989). *The
> defendant must establish that there is a substantial possi-
> bility that the verdict would be affected if the trier of fact
> had the opportunity to consider the information contained
> in the records* at issue.

98 Md.App. at 367–68, 633 A.2d 455 (citation omitted; empha-
sis supplied). Absent such a showing, not even the judge
himself should review the privileged material:

> *The trial judge,* however, *should not make an in camera
> review* of each and every document that contains privileged
> information. The patient's claim of privilege shall be hon-
> ored *unless the need for inspection has been established.*

98 Md.App. at 369, 633 A.2d 455 (emphasis supplied). Judge
Murphy reiterated the burden that is on the defendant to
cross that initial threshold:

> The burden is on the defendant to persuade the trial
> judge that there is a substantial possibility that ... al-
> though privileged, the records contain information that
> might influence the determination of guilt.

*Id.*

*Goldsmith v. State,* 337 Md. 112, 651 A.2d 866 (1995), was a
case where a former abuse victim testified as to sexual abuse
at the hands of her stepfather that had occurred between

eleven and eighteen years before. Aware that she was in therapy with a psychologist, the defendant sought access to her psychotherapy records. She invoked the psychotherapist-patient privilege under Cts. & Jud. Proc. Art., § 9–109.

 With respect to a defendant's entitlement to review such privileged information pretrial, the privilege is an absolute bar and there is no such entitlement under any circumstance:

> [N]othing in Md. Rule 4–264 permits the discovery of Laura's privileged psychotherapist records.

> [P]sychotherapist records are privileged under § 9–109 and Md. Rule 4–264 specifically precludes such privileged records from pretrial discovery. . . . Thus, we hold that Md. Rule 4–264 means what it says and precludes pretrial discovery of a victim's privileged psychotherapist-patient records.

337 Md. at 123, 651 A.2d 866.

An absolute bar to pretrial discovery, however, does not imply that a defendant may not enjoy a limited right of access to privileged information at trial:

> Although we found no constitutional right to pre-trial discovery of the records at issue in the present case, we wish to distinguish between a defendant's right of access to information during pre-trial discovery as opposed to the defendant's constitutionally based right *at trial* to fairly present a defense. In holding that a defendant has no right to pre-trial discovery of privileged records held by a third party, we recognize that the defendant's constitutional rights at trial may outweigh the victim's right to assert a privilege.

337 Md. at 129, 651 A.2d 866 (emphasis in original).

Judge Chasanow pointed out that the burden of showing the right to disclosure at trial is on the defendant and that in the case of privileged information the burden is higher than in the case of merely confidential information:

Because of the privileged nature of the records involved in the present case, the burden of proof required of the defendant to establish a need for disclosure may be higher than that required in *Zaal.*

337 Md. at 132, 651 A.2d 866.

In *Goldsmith* there would have been no error in denying disclosure of privileged information even without a prior *in camera* review because of the failure of the defendant to make the necessary threshold showing:

[T]here was *no error in denying disclosure* with or *without in camera review* because Goldsmith did not satisfy the strong burden of proof needed to establish the necessity for the privileged information sought.

*Id.* (Emphasis supplied).

The mere possibility that privileged information may be useful for impeachment purposes will never satisfy the strong threshold requirement:

[T]here was an insufficient showing by Goldsmith of the likelihood that the records contained exculpatory information. *The mere assertion that the records in question may contain evidence useful for impeachment is insufficient to override an absolute statutory privilege, even at the trial stage.* We agree with the Supreme Court of Michigan that in assessing a defendant's right to privileged records, *the required showing must be more than the fact that the records "may contain evidence useful for impeachment on cross-examination.* This need might exist in every case involving an accusation of criminal sexual conduct." *People v. Stanaway,* 446 Mich. 643, 521 N.W.2d 557, 576 (1994). *We cannot permit a privilege to be abrogated even at the trial stage by the mere assertion that privileged records may contain information relevant to credibility.* To do so would virtually destroy the psychotherapist-patient privilege of crime victims. It has long been recognized that privileges, by their very nature, restrict access to information which would otherwise be disclosed. The rationale for this restriction has been our recognition of the social importance

of protecting the privacy encompassed by specified relationships. *Such privacy interests cannot be negated by the mere assertion of the possibility of impeachment evidence.* A defendant's constitutional rights to a fair trial simply do not stretch that far.

337 Md. at 133, 651 A.2d 866 (citation omitted; emphasis supplied).

Nothing short of the likelihood of actually exculpatory information will justify overriding the privilege:

We therefore hold that in order to abrogate a privilege such as to require disclosure at trial of privileged records, *a defendant must establish a reasonable likelihood that the privileged records contain exculpatory information necessary for a proper defense.* In the present case, the defendant did not establish the likelihood that the records sought would provide exculpatory information.

337 Md. at 133–34, 651 A.2d 866 (footnotes omitted; emphasis supplied).

▪ In this case, the appellants did not make the necessary threshold showing of what *Reynolds,* 98 Md.App. at 368, 633 A.2d 455, described as "a substantial possibility that the verdict would be affected if the trier of fact had the opportunity to consider the information contained in the records in issue." Nor did the appellants make the necessary threshold showing of what *Goldsmith,* 337 Md. at 133–34, 651 A.2d 866, described as "a reasonable likelihood that the privileged records contain exculpatory information necessary for a proper defense." Indeed, at the hearing on March 19, counsel for Rose Mary Fisher acknowledged, "We have no way of knowing, without having access to those records, whether there is exculpatory material or not." That does not do it.

We see no error in Judge Levitz's ruling denying the appellants access to or the use of the privileged information concerning the post-June 25 (or even pre-June 25) diagnosis and treatment of Georgia Fisher by psychologists and psychiatrists at whatever institutions or locations may have been involved. Our alternative and secondary holding with respect

to this privileged information is the same as it was *supra* with respect to the confidential information.

## Concealing the Whereabouts
## of Georgia Fisher

■ All three appellants claim that Judge Levitz committed reversible error in refusing to order the State, as part of pre-trial discovery, to reveal to them the whereabouts of Georgia Fisher and to facilitate access to her. The appellants rely on Maryland Rule 4–263(b)(1), which provides:

(b) *Disclosure upon request.* Upon request of the defendant, the State's Attorney shall:

(1) Witnesses. Disclose to the defendant the name *and address* of each person then known whom the State intends to call as a witness at the ... trial to prove its case in chief....

(Emphasis supplied). The appellants, of course, had been furnished with the name of Georgia Fisher as the key prosecution witness. It was only her current address or whereabouts that was withheld.

Georgia Fisher was a vulnerable and abused fifteen-year-old child. The appellants were 1) her mother, 2) her older sister, and 3) her older sister's live-in boyfriend, all of whom were about to be tried for having continuously and brutally abused her over a period of many months. They were also about to be tried for having murdered her nine-year-old sister in her presence. The assistant state's attorney informed Judge Levitz that Georgia was in a "secure environment" and that "she unequivocally does not wish to speak to any of the defense attorneys or any of their doctors." Judge Levitz concluded that that "seems to me to be the end of the matter" and declined to order the disclosure. We agree.

We draw the attention of the appellants to Rule 4–263's further provision, subsection (c)(3), which goes on to point out:

This rule does not require the State to disclose:

(3) Any other matter if the Court finds that its disclosure would entail a substantial risk of harm to any person outweighing the interest in disclosure.

Nothing in *Mora v. State*, 123 Md.App. 699, 724–26, 720 A.2d 934 (1998), invoked by the appellants, suggests that Judge Levitz was in error. With respect to two of the five witnesses involved in that case, "the State [had] moved for a protective order limiting disclosure of the address of these witnesses based upon their fear of the defendant." 123 Md. App. at 724–25, 720 A.2d 934. A critical difference between *Mora* and this case is that the trial judge there denied the State's request for a protective order whereas here Judge Levitz permitted Georgia's whereabouts to be withheld. Notwithstanding the trial judge's decision in *Mora* to compel the discovery of the addresses, the State nonetheless refused to reveal the witnesses' "current locations." On that basis the *Mora* court opined that "the State *may well have* violated Maryland Rule 4–263 requiring disclosure of the names and addresses of witnesses." 123 Md.App. at 725, 720 A.2d 934. (Emphasis supplied).

There was not, however, a firm decision in that regard and that certainly was not the holding of the case. The thrust of the *Mora* opinion was that even granting, *arguendo,* a violation of Rule 4–263, the "determination of what, *if any,* sanction will be imposed for a violation of discovery" is committed to the wide discretion of the trial judge. *Id.* (Emphasis supplied). "While the trial judge, in his discretion, could have elected to exclude the witnesses' testimony," the *Mora* court saw "no abuse of discretion by the court or prejudice to the appellant in his refusal to do so." 123 Md.App. at 726, 720 A.2d 934.

The only relief afforded for the assumed **violations of discovery** in that case was to give "the defense the opportunity to interview those witnesses outside of the presence of the jury, *if the witnesses were willing.*" 123 Md.App. at 725–26, 720 A.2d 934 (emphasis supplied). In our case, by contrast, there were no violations of discovery. Even if there had been,

for the sake of argument, there was demonstrably no prejudice from not knowing the whereabouts of Georgia because Georgia was, in any event, not willing to talk to anyone representing the defense.

In *Mora*, moreover, Judge Adkins discussed the highly deferential nature of appellate review when assessing a trial judge's discretionary ruling in a discovery dispute:

> Our Court of Appeals has stated clearly the limited role of an appellate court when reviewing a ruling on a discovery dispute: "We fully recognize that ruling on discovery disputes, determining whether sanctions should be imposed, and if so, determining what sanction is appropriate, involve a very broad discretion that is to be exercised by the trial courts." A trial court decision will be disturbed only if there is an abuse of discretion.

123 Md.App. at 726, 720 A.2d 934 (citation omitted). Judge Levitz clearly did not abuse his discretion in this case.

## The Mirror Images
## Of Joinder and Severance

All three appellants, whether they phrase it as an erroneous joinder or as an erroneous refusal to sever, contend that they were erroneously required to stand trial together. The contention breaks down into two completely unrelated subcontentions.

### A. *Apres Vous, Mon Cher Alphonse. Apres Vous, Mon Cher Gaston* :

Mary Utley and Rose Mary Fisher do not, on the substantive merits of joinder-severance law, challenge the fact that they stood trial with each other and with Frank Scarpola. They press only the procedural hypertechnicality that the State failed to file a timely written motion for joinder as is required, they allege, by Md. Rule 4–252. Rule 4–252(a)(5) does, indeed, list among the mandatory motions covered by the rule "a request for joint or separate trial of defendants or offenses." Subsection (e) does indeed state that "[a] motion

filed pursuant to this Rule shall be in writing. . . ." Subsection (b) does indeed state that "[a] motion under section (a) of the Rule shall be filed within 30 days after the earlier of the appearance of counsel or the first appearance of the defendant before the court. . . ."

On August 20, 1997, the State had timely and properly moved to have the trials of Mary Utley and Frank Scarpola held jointly. It was not equally punctilious, however, about joining the trial of Rose Mary Fisher to that of her codefendants. Utley and Fisher claim that the State's final and necessary motion to join Fisher's trial with the trials of the others was neither in writing, as required by subsection (e), nor filed within the requisite thirty days, as required by subsection (b).

At a pretrial hearing on October 23, 1997, to consider the severance motions filed by the appellants, the State's official position was indisputably clear that it wished all three appellants to be tried together. That position, albeit on the record in open court, was, to be sure, merely oral and not pursuant to a motion in writing. It was conceded by the State, moreover, that October 23, 1997 was not within the requisite thirty days. Notwithstanding the fact that Judge Levitz on October 23 conducted a full hearing on the merits of the joinder-severance issue and decided that the trials of the three defendants would not be severed, the State nonetheless filed, on November 14, a formal request for joinder in writing. At a hearing on November 25, it explained that it had done so out of an "excess of caution" and asked that the filing be accepted *nunc pro tunc*. Judge Levitz treated this entire question of the State's alleged procedural peccadillos as a "tempest in a teapot." We could not be in more complete agreement.

In the circumstances of this case, one obvious reason to dismiss the Utley–Fisher contention is that Rule 4–252(a) contains no sanction other than to provide that if a party does not raise a particular matter by a motion in conformity with the Rule, that matter will be treated as **"waived unless the**

**court, for good cause shown, orders otherwise."** In this case, the State's desire to have the appellants tried jointly ("the matter") was not waived for the obvious reason that Judge Levitz (**"the court"**), after a full consideration of the merits (**"for good cause shown"**), ordered that they should be tried together (**"ordered otherwise"**).

Although it would be easy to dismiss the Utley–Fisher subcontention as a triviality, if not an absurdity, it is difficult to put into words just why our instinctive appraisal of the contention is legally correct. We welcome the difficulty because it is a worthwhile exercise, periodically, to have to pin down in intelligible terms an instinctive but elusive "feeling," such as this, about an issue. Why precisely was the State, if it wanted the three appellants tried together, not required to file a motion for joinder in compliance with the "precise rubric" of Maryland Rule 4–252?

Rule 4–252(a)(5) refers to alternative and, indeed, diametrically different forms of relief, to "a request for joint or separate trial." They, of course, are flip sides of the same coin. Whichever side is formally ordered, pursuant to Rule 4–252, to be "up," the obverse side will necessarily be "down," without any further formal action being required. The denial of a joinder is *ipso facto* the granting of a severance, just as the denial of a severance is *ipso facto* the granting of a joinder. Whatever the procedural posture that brings the issue before the court, the court's consideration of the indivisible joinder-severance issue is on precisely the same merits. The answer will be the same, regardless of how the question is framed. The two formal postures the question might take are mirror images of each other. However the decision is made, moreover, it is self-evidently not necessary to make it twice, once in each direction. An architectural assessment of the Leaning Tower of Pisa will be the same whether the tower is leaning to the left or leaning to the right.

In this case, the appellants moved for a trial severance. After a hearing and a consideration of the merits, Judge Levitz denied the severance. As a logically ineluctable conse-

quence of that, a joint trial would follow. Despite a consequence that would seem to have been inevitable, Utley and Fisher are nonetheless dismayed at what we see as nothing more than an Alphonse–and–Gaston routine as to who, as the moving party, must go through the courtroom door first.

For rare occasions such as this, when a party is unduly sensitive about a social nicety such as who must speak first, the obvious answer is that whoever wishes to change the *status quo* must be the moving party. That, in turn, however, raises the question of what, when it comes to the trial of possible codefendants, is the *status quo?*

No elaborate and formal scheme has ever been devised to answer that question, a question that, as a practical matter, frequently just answers itself. If three defendants are indicted on the same charges in a single indictment, they might seem to be presumptively destined for a joint trial. If three defendants are indicted on different days on different charges, they might seem to be presumptively destined for separate trials. If they are indicted in different indictments but on the same charges, it is more problematic as to what, if anything, is destined in terms of trial. As a practical matter, an infinite variety of events may shape the *status quo* and it has not been thought necessary to design an elaborate matrix, providing for every possible permutation.

Whether the impending joint trial in this case was in the first instance the product of 1) an order by the trial judge, 2) the habitual or accidental operating pattern of the Assignment Office, 3) the acceding by the Assignment Office to a request by the State, 4) the random flip of a coin, or 5) some mysterious process beyond our ken does not really matter. By whatever the modality, it had become, unmistakably, the *status quo* as of October 23, 1997.

At the October 23 hearing, Judge Levitz made it clear that at an earlier conference among all the parties in September, a single trial date had been set before him for all three defendants and it was assumed by everyone that there would be a joint trial unless somebody in the meantime moved for and

was granted a trial severance. That is also why the moving parties as of October 23 were the appellants. That is why any proposed action by the State in the opposite direction would have been ridiculously superfluous. Mary Utley and Rose Mary Fisher have nothing of which to complain.

As we seek to pin down this somewhat elusive issue, the establishing of the initial *status quo* turns out to be the critical point. To the ultimate detriment of their contention, there is no rule regulating the original scheduling mechanism. It just happens—in different ways in different jurisdictions, sometimes in different ways from day to day in the same jurisdiction. It is only at that point that Rule 4–252(a)(5) or Rule 4–253(a) and (c) "kicks in" for the first time, permitting those aggrieved by what chance has produced to seek to change it. Those content with the pending *status quo* self-evidently need do nothing.

### B. *The Denial of a Trial Severance for Frank Scarpola:*

■ Frank Scarpola, more mundanely, is concerned with the actual merits of Judge Levitz's decision not to grant him a trial severance. Scarpola properly recognizes that the key test for ordering a joint trial of several defendants is that of the mutual admissibility of the evidence. If the evidence admissible against any defendant would be mutually admissible against the other defendants a trial severance is not required. As this Court announced in *Eiland v. State,* 92 Md.App. 56, 72–73, 607 A.2d 42 (1992), *rev'd on other grounds,* 330 Md. 261, 623 A.2d 648 (1993):

> The necessary precondition for the granting of a trial severance is the likelihood of prejudice. What then, under the law of this state, does that term of art "prejudice" mean? . . .
>
> The case law is unequivocal. "Prejudice as a term of art means damage from inadmissible evidence, not damage from admissible evidence." . . .
>
> So long as *most* of the evidence at a joint trial is mutually admissible against both defendants, joinder is proper.

(Citations omitted; emphasis in original). *See also McKnight v. State*, 280 Md. 604, 375 A.2d 551 (1977); *Osburn v. State*, 301 Md. 250, 254–55, 482 A.2d 905 (1984); *Stevenson v. State*, 43 Md.App. 120, 130, 403 A.2d 812 (1979), *aff'd*, 287 Md. 504, 413 A.2d 1340 (1980); *Sye v. State*, 55 Md.App. 356, 362, 468 A.2d 641 (1983).

It is not even necessary that all of the evidence be mutually admissible, only that most of it is. As Judge Bloom pointed out for this Court in *Cook v. State*, 84 Md.App. 122, 130, 578 A.2d 283 (1990):

> "[J]oinder of defendants for trial is favored for reason of judicial economy . . . and is appropriate 'where most, if not all, of the evidence admitted at trial would have been admissible in each trial if the several defendants had been tried separately.'"

Indeed, mutual admissibility is not the key criterion for trial joinder, it is the only criterion. As *Eiland* observed:

> This possibility of significant damage to a defendant by evidence inadmissible as to him but admissible against a codefendant is the only criterion for measuring joinder/severance ever recognized by Maryland law. Unless damaging evidence is not mutually admissible, a trial severance is, indeed, contraindicated. As we stated in *Ball v. State*, 57 Md.App. 338, 353, 470 A.2d 361 (1984), "A severance is called for *only* when a defendant will be significantly prejudiced by evidence admissible against a codefendant but not admissible against him."

92 Md.App. at 73–74, 607 A.2d 42 (emphasis in original).

In *Moore v. State*, 84 Md.App. 165, 169, 578 A.2d 304 (1990), Chief Judge Gilbert stated:

> A defendant is deemed to have been prejudiced by a joint trial when the joining of a co-defendant or co-defendants (1) permits the State to introduce, against a particular defendant, otherwise inadmissible evidence, and (2) that otherwise admissible evidence tends to contradict the defendant's theory of the case.

▮ In this case, our review of the evidence does not reveal a single item that came in against either Mary Utley or Rose Mary Fisher that was not equally admissible against Frank Scarpola. Scarpola himself points to none. In his brief, he reiterates certain of his pretrial objections concerning potential *Bruton*[8] problems. When all three appellants testified at trial, however, all potential *Bruton* problems disappeared.

Because of the conspiracy charges against all three appellants with the acts of each conspirator attributable to the other conspirators, mutual admissibility was essentially foreordained. Pertinent here are the observations of Judge Rosalyn Bell in *Ogonowski v. State*, 87 Md.App. 173, 186–87, 589 A.2d 513 (1991):

> Under Rule 4–253(a), *a trial court may conduct a joint trial of two defendants, even if they are charged in separate charging documents "if they are alleged to have participated in* the same act or transaction or in *the same series of acts or transactions* constituting an offense or offenses." . . .
>
> . . .
>
> [I]t was undisputed that the two charging documents . . . were, except for the indictment number, duplicates. . . . Moreover, *the charges included continuing conspiracies between the men, a significant factor favoring a joint trial.*

(Citations omitted; emphasis supplied). *See also Tichnell v. State*, 287 Md. 695, 710–13, 415 A.2d 830 (1980); *Frazier v. State*, 318 Md. 597, 609–11, 569 A.2d 684 (1990); *Manuel v. State*, 85 Md.App. 1, 15–18, 581 A.2d 1287 (1990).

▮ The standard of appellate review for Judge Levitz's decision to deny the severance is the abuse of discretion standard. Our comment in *Solomon v. State*, 101 Md.App. 331, 348, 646 A.2d 1064 (1994), is still pertinent:

---

**8.** *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

[W]e have found no Maryland decision where, once the initial hurdle of mutual admissibility has been cleared, a decision by a trial judge to order a trial joinder has ever been held to be an abuse of discretion.

(Footnote omitted).

In the last analysis, Scarpola appears to have been the net beneficiary of the joinder and not its victim. There were charges against him for the rape of Georgia Fisher that would have been joined for trial against him had he gone to trial alone. Those charges were severed from this case, however, because evidence of that crime was not mutually admissible against Mary Utley and Rose Mary Fisher. It is hard not to be skeptical about his present complaint.

Scarpola goes on to raise the specter of hostility among the appellants and their defenses. That issue was raised in *Eiland,* 92 Md.App. at 74–75, 607 A.2d 42:

Resiliently, ... the appellants continue to squirm even when they are clearly down. Out of thin air, they attempt to confect an additional criterion for measuring joinder/severance—"hostility between the defenses." Ingeniously, they have combed the case law and uncovered four instances where, in passing *dicta,* the phrase "hostile defenses" has actually been uttered. Those passing utterances, however, had been in the context of mutually inadmissible and damaging evidence actually introduced.

(Footnote omitted). After examining the case law, *Eiland* concluded:

In *Sye v. State,* 55 Md.App. 356, 468 A.2d 641 (1983), one of the appellants made the very argument made by the appellants here—that severance was necessary "because his version of the altercation that led to the killing differed from the versions given by his codefendants."

. . .

The mere fact that a joint trial may place a defendant in an uncomfortable or difficult tactical situation does not

compel a severance. Only the threat of damaging inadmissible evidence does that:

"The pertinent question is not whether the State might have had, in some other procedural configuration, a more difficult time in obtaining the testimony of Brooks and Sye. The pertinent question rather is whether the testimony of Brooks and Sye was competent and admissible. It clearly was. Bates was damaged but the damage was legitimate. He received a fair trial with the State using only admissible evidence. The State did not offer any evidence admissible against the others but inadmissible against Bates."

55 Md.App. at 363, 468 A.2d 641.

The same argument was also before us on yet an earlier occasion. We rejected it, speaking through then Chief Judge Murphy, in *Lipscomb v. State,* 5 Md.App. 500, 248 A.2d 491 (1968). In a joint trial of two codefendants for rape, one claimed that the sexual intercourse was completely consensual. He was understandably chagrined by his codefendant's starkly contrasting testimony that the victim had struggled and the codefendant had been enlisted to help hold her down. Lipscomb claimed that the testimony of the codefendant was prejudicial. We pointed out that prejudice consists not of being damaged or incriminated by the evidence but only of being damaged or incriminated by evidence that is inadmissible.

92 Md.App. at 76–77, 607 A.2d 42.

Scarpola finally alleges but fails to point to a single instance at trial of not being permitted to cross-examine his codefendants fully because of the fact that they themselves were on trial and might be prejudiced. We see no error in the denial of a trial severance to him.

### The Admissibility of Certain
### Out–of–Court Statements

Mary Utley alone raises a scattershot contention about a variety of extrajudicial statements that she claims were erro-

neously admitted into evidence. Mary Utley first mentions a single hearsay declaration referred to, over her objection, in the opening statement for Frank Scarpola. She has, however, nothing more to say about it. Under those circumstances, neither have we. Maryland Rule 8–504(a)(5). *Van Meter v. State*, 30 Md.App. 406, 407–08, 352 A.2d 850 (1976).

A more significant sub-contention concerns an out-of-court assertion made by Rita Fisher on January 7, 1997, to Lorraine Thomas, Rita's third grade teacher. Ms. Thomas had observed that Rita's face was severely bruised when she arrived at school that morning. Ms. Thomas sought to ascertain who or what was responsible. On cross-examination by co-defendant Frank Scarpola, Ms. Thomas testified to Rita's out-of-court assertion "My mom did it." That assertion was offered for the truth of the thing asserted, to wit, that Mary Utley had hit her nine-year-old daughter in the face and badly bruised her on or shortly before January 7, 1997. The assertion was classic hearsay and did not qualify for any of the traditional "firmly rooted" hearsay exceptions.

The admissibility of the hearsay declaration turned on Maryland Code (1996 Repl.Vol.) Article 27, § 775. Generally speaking, § 775 was clearly applicable. The forum was "a criminal proceeding" for "child abuse." The witness and hearsay auditor was a "teacher" who was "acting in the course of [her] profession when the statement was made." Mary Utley challenges admissibility under § 775 in two specific regards. She claims initially that she did not receive adequate notice pursuant to § 775(c)(3), which provides in pertinent part:

(3) In order to provide the defendant with an opportunity to prepare a response to the statement, the prosecutor shall serve on the defendant in a criminal proceeding . . . and the alleged offender's attorney . . . at least 20 days before the criminal proceeding in which the statement is to be offered into evidence, notice of:

(i) The State's intention to introduce the statement; and

(ii) The content of the statement.

■ The notice requirement was not violated. In the first place it was not applicable. The statement was not introduced by the State. The prosecutor, charged with serving notice on a defendant, was not in any way involved.[9]

Quite aside from that, counsel for Frank Scarpola, who offered the statement, gave notice of his intention to do so to counsel for Mary Utley on March 20, 1998. Counsel for Utley does not contest receiving notice, but protested that it was on March 27 rather than on March 20. Mary Utley argues that although the notice may have been given, accepting the later date, twenty-six days before the hearsay was actually offered, it was given only nineteen days before the trial literally commenced on April 15. Even assuming, *arguendo*, that notice from one co-defendant to another is implicitly required (we are not so holding), we agree with Judge Levitz's interpretation of the critical date from which one counts backward:

> It's when you move to introduce the statement. You had more than 20 days notice.

■ Mary Utley also argues that § 775(b)(3)'s requirement that the statement "possess particularized guarantees of trustworthiness" was not satisfied. Her primary attack on trustworthiness is that Rita gave several other explanations for her bruises before she identified her mother as the source. Out of the presence of the jury, Judge Levitz probed the trustworthiness issue and, if anything, the progression of the explanations enhanced the trustworthiness of the final version. With the jury in recess, Ms. Thomas testified as to the circumstances surrounding the statement. Several other teachers reported to her that they had noticed bruises on Rita's face. Ms. Thomas found Rita and took her into a private office. She went on:

---

**9.** The prosecutor quite candidly volunteered that if the statement had not come in through the co-defendant, the State would have offered it. In terms of both "intention to introduce" and "content" under § 775(c)(3), the prosecutor informed the court that the statement had been furnished to all three defendants "long ago in discovery." Counsel for Mary Utley could only protest that he had "received over a thousand pages in discovery."

Rita and I went into the office and I sat down and Rita was very quiet. And timid. And I asked her, how did she get her bruises. She told me that she fell.... It was kind of like in a whispery voice ... When I looked at the bruises it appeared as there were finger marks, so I didn't believe that just falling would have caused those kind of marks. So then I asked her, you know, Rita, how did you get these? And then she told me that she was playing roughly with her dog and that the dog had jumped on her face. I still didn't think that the bruises could have been caused by a dog jumping on her. So I asked her again, Rita, how did you get those bruises. And then she told me that her mother had hit her.

Ms. Thomas also observed that "the bruising on [Rita's] face looked like finger marks." Rita also told the same story, that her mother had hit her, to her psychologist, Judith Wall, and to the school guidance counselor, Lisa Scherr. Judge Levitz concluded that there were, indeed, particularized guarantees of trustworthiness and he ruled that the statement was admissible. We hold that he did not abuse his discretion in so ruling. Before us, Mary Utley raised two other subcontentions with respect to the declaration of January 7, 1997. They were not raised before Judge Levitz, however, and we take no notice of them.

Mary Utley also challenges the introduction of the same out-of-court declaration by Rita Fisher as it was testified to by the school guidance counselor, Lisa Scherr, who was called as a witness by co-defendant Frank Scarpola. Our analysis and our holding with respect to Lisa Scherr's testimony are exactly the same as they were with respect to the introduction of the same declaration offered by Lorraine Thomas.

■ Mary Utley also challenges as inadmissible hearsay two aspects of the testimony of Mary Friedman, an instructional assistant at Rita's school, who observed Rita over a period of months and described her condition. She described Rita's eating habits:

Rita always was a good eater. She was entitled to the free breakfast and the free lunch program that Baltimore County offers. And she always ate the breakfast when she came to school. She ate the lunch. She was a good eater. She was always hungry. When we would have class parties or extra treats for doing a good job she always ate everything we gave her. Sometimes she even asked for more.

Q: Did you ever find it necessary to supplement what she was getting at school and give her extra food?

A: Yes.

Q: Did you personally bring food in for her?

A: Yes, I did. I, towards the second half of the school year getting towards the end I started packing her a hearty snack that she used to eat every day at 3:00 o'clock before she went home.

Q: What about the other teachers, do you know whether any of them brought food?

A: Yes, Miss Thomas brought food in to supplement her breakfast and her lunch, extra snacks.

Q: As the year progressed did she ever complain to you that she was hungry?

A: Yes. Yes.

[Counsel for Mary Utley]: Objection, Your Honor, motion to strike.

[The Court]: Overruled.

We agree with Judge Levitz that that was not a hearsay assertion but a statement of bodily condition. What was being described was Rita herself.

 We hold exactly the same with respect to another observation of Rita made by Mary Friedman. Rita had been sent to the nurse's office because of a stomach ache. In such a case, the nurse routinely sends a form letter home to the child's parent. Mary Friedman's description was of Rita Fisher's frightened reaction.

Rita came in that morning complaining of a stomach ache. So I sent her to the nurse. She was there for a little while, then she came back and sometimes the nurse sends a form letter home with the child that states they have been to the nurse's office, and why they were there.... The day went on as normal, usual. Then at the end of the day around 3:00 o'clock I began calling the children to go to their lockers to get their book bags and go back up and get ready to go home. When I called Rita's name she just sat in her seat, she didn't answer. She made no attempt to get up.... So I called her a couple more times and she still just sat there. So finally by this time all the other children are out at their lockers. So I went over, right to her desk in front of her and told her. I said, Rita, it's time to go home, you need to go get your things and pack up. And I could see she was very upset. She was getting ready to cry. Her eyes were filling up. So I said to her, I said, if you don't try and tell me what's wrong I can't help you. And she said, I am going to get in trouble at home.

[Counsel for Mary Utley]: Objection.

The Court: Overruled.

Q: Go ahead.

A: She said I am going to get in trouble at home. And I asked her why, she said because—

[Counsel for Mary Utley]: Objection, Your Honor.

The Court: This is not being admitted for the truth of the matter asserted, but merely the witness made the statement. It is not hearsay. Overruled.

Q: I am sorry, go ahead.

\*　　\*　　\*

[Counsel for Rose Mary Fisher]: I would ask for a continuing objection.

The Court: You may have one. Go ahead. You can continue, Miss Friedman.

A: She said, I am going to get in trouble at home, because I am not supposed to tell when my stomach hurts. So I

knew something was terribly wrong. I knew Rita was afraid, so I didn't even have to take a long time to think about it, I said to her, how about Rita, if I take that letter out of your folder and we won't send it home. And immediately a look of relief came over her face. I didn't have to say another word to her. She got up out of her seat, she wasn't—she got her things, she packed up, she got ready and we started walking down the hallway to get on the bus. And on the way out to the door she turned around and she asked me, did you take the letter out of my folder and I assured her that I had.

Once again, Judge Levitz's feel for the evidence was unerring. That testimony, at its most fundamental level, involved not an out-of-court narration of events by a nine-year-old girl; it was an in-court description of a nine-year-old girl and, therefore, not hearsay.

Dr. James L. Locke, the Assistant Medical Examiner, testified to the cause of Rita Fisher's death as being dehydration and malnutrition. In elaborating on the basis for his conclusion, he mentioned that his office had been "informed that the decedent had not received food and water." In overruling an objection, Judge Levitz advised the jurors that they were "not to accept as true" that statement "other than [as] it goes to the basis of [Dr. Locke's] opinion." There was no further objection and no call for further instructions. We see no error.

■■■ Mary Utley also complains about the admission of an out-of-court statement given by Rose Mary Fisher. Shortly after her arrest, she gave a statement to the police. After satisfying himself that neither *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) nor the Maryland common law as to voluntariness had been violated, Judge Levitz admitted that statement into evidence over the objection of all three appellants. The only concerns expressed by counsel for any of the appellants at that time were those involving standard criminal procedure issues.

The prime concern was with *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), and the fear that something said in that statement by Rose Mary Fisher could be used against Mary Utley or Frank Scarpola without them having the right to confront their "accuser." *Bruton,* however, has been held not to apply when the confessing co-defendant takes the stand and is available for cross-examination. Rose Mary Fisher took the stand and was cross-examined by counsel for both Mary Utley and Frank Scarpola. Consequently, neither *Bruton* nor the Confrontation Clause of the Sixth Amendment was violated. *Nelson v. O'Neil,* 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971).

Mary Utley's argument on this subcontention is from another astral plane, as she invokes Maryland Rule 5–803(a) and *State v. Matusky,* 343 Md. 467, 682 A.2d 694 (1996), which concern the admissibility of out-of-court assertions made by non-testifying declarants. What Mary Utley ignores is that the key to the admissibility of Rose Mary Fisher's statement was that it was admissible against Rose Mary Fisher. That such a statement by one co-defendant may then, in a joint trial, have a spin-off adverse effect on another codefendant may be unfortunate from Mary Utley's point of view, but our toleration of such a possible spin-off effect is limited only by the constraints of *Bruton v. United States.* The *Bruton* constraints were not violated in this case.

The reference to *State v. Rivenbark,* 311 Md. 147, 533 A.2d 271 (1987), goes even further afield because the Rose Mary Fisher statement at issue was not offered as a statement by a coconspirator, was not admitted into evidence as a statement by a coconspirator, and was never even remotely alluded to as a statement by a coconspirator by anyone.

### Evidence of Misconduct
### Other Than That Formally Charged

█ Mary Utley alone contends that during the cross-examination of Georgia Fisher by counsel for co-defendant Frank Scarpola, Judge Levitz erroneously permitted Georgia Fisher to testify to misconduct on the part of Mary Utley that

occurred before April 15, 1997, the beginning of the time period literally charged in the indictment. The only ruling in issue was the following:

Q: You remember telling social workers at various times that you were afraid of being around your mother?

A: Yes.

Q: And you remember telling them that before Frank moved into the house?

[Counsel for Mary Utley]: Objection.

The Court: Overruled. You can answer.

A: Yes.

Q: Why were you afraid of being around your mother before Frank moved into the house?

A: Because my mom used to abuse me.

Without subsequent objection by Mary Utley, Georgia elaborated on what she meant by "abuse," first by listing such innocuous disciplining as "not going outside, not watching TV, [and] not doing anything except clean." More significantly, however, Georgia explained that her mother would also discipline her by putting her in the "hole," and that the pattern of putting her in the "hole" had gone on for approximately one year before Frank Scarpola moved into the house.

The thrust of Mary Utley's defense was that the abuse of her two younger daughters only began after Frank Scarpola moved into the house and after the disciplining of the girls had been effectively delegated to him. Mary Utley disclaimed any malice or intent to harm the children. Under the circumstances, her abusive conduct for the year before the arrival in the home of Scarpola was highly probative of her malice, her intent to harm, and her full complicity in that particular modality of excessive disciplining that continued even after Scarpola became the primary disciplining agent.

In *State v. Taylor*, 347 Md. 363, 372–73, 701 A.2d 389 (1997), Judge Chasanow observed:

Lack of intent or malice was a contention of the defense in the instant case. *Proof of other brutality against Keith*

*by his stepfather was admissible to prove Taylor's intent and malice.* In addition, where a primary issue is the culpable state of mind of the defendant, any chance of prejudice by virtue of the admission of prior bad acts is less than if the primary issue is identity of the perpetrator.... The contention was that either Keith was fabricating his claims of child abuse or Taylor was acting in the role of Keith's father, and these were permissible disciplinary acts, not child abuse and battery.... *Intent to cause physical injury and malice were important elements of the State's case.*

(Emphasis supplied).

What *State v. Taylor* then said with respect to corporal punishment is equally applicable to Mary Utley's pattern of conduct in consigning her daughters to the "hole."

Where a parent uses severe corporal punishment, *often the only way to determine whether the punishment* is a noncriminal act of discipline that was unintentionally harsh or whether it *constitutes the felony of child abuse is to look at the parent's history of disciplining the child. The probative value* of recent corporal punishment used on a child in order to determine the parental disciplinarian's malice and intent *far exceeds its potential for unfair prejudice. ... A parent's other disciplinary acts can be the most probative evidence* of whether his or her disciplinary corporal punishment is imposed maliciously, with an intent to injure, or with a sincere desire to use appropriate corrective measures.

347 Md. at 377, 701 A.2d 389 (emphasis supplied).

The strong relevance and therefore the admissibility of the testimony about the history of abuse is clear even without the additional relevance injected into this case by Mary Utley's effort to cast almost exclusive blame on Frank Scarpola and by Frank Scarpola's counter effort to deflect so exclusive an onus of responsibility.

## Frank Scarpola's Cross–Examination
## of Mary Utley

■■■ Mary Utley alone contends that she was subjected to impermissible and prejudicial cross-examination. She testified in her own defense. The thrust of her testimony was essentially to absolve herself of 1) the direct physical abuse of her two younger daughters and 2) any significant awareness that such abuse was taking place. The ultimate effect of her testimony was to shift a lion's share of the blame to co-defendant Frank Scarpola.

Understandably chagrined, Frank Scarpola sought, in his counsel's cross-examination of Mary Utley, to counter that effect. It is a commonplace that the ultimate goal of successful cross-examination, albeit a goal seldom realized, is to expose an adverse witness as a liar.[10] Frank Scarpola, as was his right, sought to do just that with Mary Utley. The heart of Mary Utley's present contention is that the cross-examination of her effectively accomplished what it set out to accomplish.

One way to expose falsehood is to highlight, as dramatically as possible, the number of witnesses, ideally neutral witnesses with no reason to fabricate, who have given contradictory accounts. Scarpola confronted Mary Utley with a series of such contradictory accounts of various parts of her testimony. One was the account of a nurse from Northwest Hospital:

Q: You remember saying to the nurse at Northwest Hospital, that you felt responsible for Rita's death?

A: No.

Q: So if a nurse testified to that, that nurse would be lying?

[Counsel for Mary Utley]: Objection.

The Court: Overruled.

A: I don't remember saying that to the nurse.

---

**10.** John Henry Wigmore praised cross-examination as "the greatest legal engine ever invented for the discovery of truth."

There was then a social worker from the Department of Social Services.

Q: Would you ever let [Rita] run around at night when she was a small child?

[Counsel for Mary Utley]: Objection.

The Court: Overruled.

A: No.

Q: You remember Mrs. Deiner testifying the other day?

A: Yes, I do.

Q: So, she was not telling the truth as well?

A: Rita—

[Counsel for Mary Utley]: Objection, Your Honor.

The Court: Overruled.

A: Rita wasn't even, I don't believe, walking at that age.

Q: Well, how about Georgia, was she walking, was she lying about Georgia running around?

A: As I just said, they would walk around at night like normal children, but again, I don't believe Rita was walking at the age that she said she was out.

Q: *So then Mrs. Deiner was not telling the truth?*

A: *Yes.*

(Emphasis supplied).

There was also the separate but reinforcing testimony from two detectives.

Q: Now, Detective Walsh, she said, you heard her say that you were laughing after Rita died, *was she not telling the truth?*

A: *She was not telling the truth.*

Q: *And Detective Hill—*

A: *He was not telling the truth.*

Q: I didn't ask the question yet. Was Detective Hill telling the truth when he said you were laughing and you thought Rita's death was a big joke?

A: *He was absolutely not telling the truth at all.*

Q: So, both of these detectives, have you ever met them before?

A: Only at the hospital and at the building.

Q: You know of any reason why these detectives would lie to the ladies and gentlemen of the jury?

[Counsel for Mary Utley]: Objection, Your Honor.

The Court: Overruled.

A: I don't know. All I know is that I didn't say what they said I said.

Q: *So then they were not being honest with the jury?*

A: *That's correct.*

(Emphasis supplied).

There was finally her daughter Rose.

Q: Rose, your other daughter, said that she never locked you in the room?

[Counsel for Mary Utley]: Objection, Your Honor.

The Court: Overruled.

Q: *Is Rose lying about that?*

A: *Yes, she is.*

Q: *So all these people are lying but Mary Utley?*

A: *That is correct.*

(Emphasis supplied).

Judge Levitz properly overruled all four of those objections for the obvious reason that the cross-examination was doing exactly what cross-examination is designed to do.

The following morning, Mary Utley's counsel reverted to the same theme and claimed, based on overnight research, that the line of questioning ran afoul of *Bohnert v. State,* 312 Md. 266, 539 A.2d 657 (1988), and its statement that "a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." 312 Md. at 278, 539 A.2d 657. Judge Levitz gave the contention the short shrift it deserved:

The Court: Let me stop you. Are you seriously wanting to argue to me that that case has anything to do with what happened yesterday?

[Counsel for Mary Utley]: That's absolutely what I am arguing.

The Court: What *Bohnert* talks about is an expert witness giving an opinion that a witness who testified at trial was truthful or not truthful. That's what *Bohnert* has to do with. Now, clearly that's not what we are dealing with here. Cross-examination when the witness gives a statement that completely contradicts what somebody else said and you asked the witness are you saying that that person was lying, what does that have to do with *Bohnert?* *Bohnert* has nothing to do with that.

We agree with Judge Levitz that *Bohnert* has nothing to do with the type of cross-examination now under review. *Bohnert* was concerned with a situation where a non-eyewitness, generally an expert witness, is called for the primary purpose of offering a neutral assessment of the credibility of a testifying witness. That has nothing to do with challenging the veracity of a testifying eyewitness by demanding an explanation of why other witnesses have given contradictory accounts.

What is said in a larger sense is not necessarily the same as what is literally said in so many words.[11] Regardless of what literal words were spoken, Mary Utley was not being asked to assess the credibility of those who had given different accounts of events. The only credibility in issue was her own. What Mary Utley was being asked to do was either 1) to acknowledge her own falsity or 2) to look foolish in denying it. Once the final rhetorical question "So all these people are lying but Mary Utley?" was asked, the skillful cross-examiner

---

11. Although Mark Anthony's literal words were, "And Brutus is an honorable man," he was actually saying the exact opposite, that "Brutus is not an honorable man." Irony is defined as "a mode of speech the intended implication of which is the opposite of the literal sense of the words." *Webster's Third New International Dictionary* (Unabridged) (1969).

would have been turning and walking disdainfully away without waiting for an answer. The answer no longer mattered.

Mary Utley moved for a mistrial. Judge Levitz denied it. We affirm Judge Levitz.

### The Inadmissibility of Expert Testimony
### Offered by Rose Mary Fisher

 Rose Mary Fisher alone has raised the contention that she was erroneously denied the right to present expert testimony bearing on her psychological state of mind. In a pre-trial motion *in limine,* the State had sought to preclude such testimony. Judge Levitz declined to make a ruling at that time and reserved judgment on the issue until after Rose Mary Fisher had testified.

Immediately after Rose Mary Fisher testified, defense counsel sought to call Dr. David Williamson, a psychiatrist. The lengthy proffer of what his testimony would consist of revealed that it was essentially a "psychological profile" of Rose Mary Fisher, most significantly indicating clinical depression (for which she was taking medication) perhaps attributable to her history of having suffered child abuse.

One potential nexus between the psychological profile and a possible issue in the trial might have been found in the profile's conclusion that Rose Mary Fisher had "a passive personality." Judge Levitz, however, noted that that nexus was never established because Rose Mary Fisher never testified that any of her actions were the result of her being subjected to or under "the domination or control of Frank Scarpola."

In regard to Dr. Williamson, my position is the same. The Maryland law is clear, evidence of mental illness that doesn't go to legal insanity is generally not admissible in a criminal case. There are exceptions where the court could admit such evidence, if, in fact, such evidence would be helpful to the fact finder, the court could exercise its discretion. If it goes to a particular issue, like as stated in *Simmons* and *Hartless,* where the defense was that this

person had such a personality profile that [she was], in fact, dominated, influenced, couldn't stop, went along with things because that was [her] personality profile.

That's not what the—this evidence, quite frankly, would be for our purposes. It would be to try to elicit sympathy for Rose Mary Fisher. And the law doesn't permit that. This is not going to be of help to the jury, because what Miss Fisher said in her testimony is that that wasn't what was going on. She didn't go along with this. She didn't, she didn't even know that it was happening, according to her testimony. She wasn't under the domination and control of Frank Scarpola.

She said Frank Scarpola never hurt the children in her presence. She never saw him hit them. She didn't, she said, initially know that they were tied up. Not that she went along with it, that she was dominated by him. She didn't say that at all. And because of that it seems to me that such evidence, exercising the discretion of the court has, really is not admissible, as the current status of the law in Maryland.

The only other conceivable nexus was the profile's suggestion that Rose Mary Fisher's denial of "an intent to do harm to either of her sisters" was "consistent with" her personality profile. In *Hartless v. State*, 327 Md. 558, 611 A.2d 581 (1992), the appellant had been convicted of first-degree murder. With respect to the appellant's intent in that case, the defense psychiatrist was prepared to testify that the appellant "did not intend to murder the victim" and that there had been "no thought, plan or intention to murder the victim." 327 Md. at 573, 611 A.2d 581. The Court of Appeals held that the psychiatric opinion was properly disallowed:

> Whichever the defendant's purpose, the opinion of Dr. McDaniel concerning the defendant's actual intent at the time of the offense was properly excluded. As this Court made clear in *Simmons v. State* (1988) and in *Johnson v. State* (1985), psychiatrists have not been shown to have the ability to precisely reconstruct the emotions of a person at a specific time, and thus ordinarily are not competent to

express an opinion as to the belief or intent which a person in fact harbored at a particular time.

*Id.* (citations omitted).

We do not agree with the appellant Fisher that *Simmons v. State*, 313 Md. 33, 542 A.2d 1258 (1988), has any bearing on this case. In reversing a trial court for not admitting a psychological profile in that case, the Court of Appeals expressly did not do so because the trial court had **abused its discretion** in deciding, on balance, not to admit the report but for the very different reason that the court had ruled that the profile was **inadmissible as a matter of law**:

> Here the judge did not purport to exclude the evidence by the exercise of discretion so that no issue of discretion is before us. The judge erroneously ruled, as a matter of law, that the evidence could not, under any circumstances, be admitted.

313 Md. at 48, 542 A.2d 1258. *Hartless,* 327 Md. at 574, 611 A.2d 581, pointed out the difference between the inadmissibility ruling *Simmons* reversed and the inadmissibility ruling it affirmed: "In contrast to *Simmons,* the trial judge in *Hartless* 's case did not rule that as a matter of law Dr. McDaniel's testimony was inadmissible."

With respect to the broad authority entrusted to trial judges when making such discretionary rulings, *Hartless* observed:

> A trial court is given broad discretion in ruling on the admissibility of expert testimony, and *the court's decision in admitting or excluding such testimony will seldom be reversed.* Reversal is warranted only if founded on an error of law or some serious mistake, or if the trial court has seriously abused its discretion.

We hold that the exclusion of Dr. McDaniel's psychological profile testimony did not amount to a clear abuse of discretion by the trial court. The record reflects that the court did not believe the psychological profile testimony was relevant to any issues in this case or to any defense generat-

ed by the defendant, or would be of appreciable help to the jury. This holding does not appear to be clearly in error[.] 327 Md. at 576–77, 611 A.2d 581 (emphasis supplied; citations omitted).

In this case, we see no clear abuse of discretion on the part of Judge Levitz.

### Legal Sufficiency of the Evidence to Prove Conspiracy to Commit Child Abuse

 The only challenge to the legal sufficiency of the evidence in this case is the limited one raised by Frank Scarpola alone. He claims that the evidence was not legally sufficient to support his convictions for 1) conspiracy to commit child abuse on Rita Fisher and 2) conspiracy to commit child abuse on Georgia Fisher. We hold that the evidence was legally sufficient in both regards.

In *Townes v. State,* 314 Md. 71, 75, 548 A.2d 832 (1988), Judge McAuliffe provided a concise definition of the crime of conspiracy:

A criminal conspiracy consists of the combination of two or more persons to accomplish some unlawful purpose, or to accomplish a lawful purpose by unlawful means. The essence of a criminal conspiracy is an unlawful agreement. *The agreement need not be formal or spoken, provided there is a meeting of the minds reflecting a unity of purpose and design.*

(Emphasis supplied). *See also Mason v. State,* 302 Md. 434, 444, 488 A.2d 955 (1985) ("[T]he agreement need not be a formal transaction involving meetings and communications."); *Seidman v. State,* 230 Md. 305, 322, 187 A.2d 109 (1962); *Jones v. State,* 8 Md.App. 370, 377, 259 A.2d 807 (1969).

 The case law is clear that from the circumstantial evidence of the criminal acts themselves, a permitted inference may be drawn that those acts were pursuant to a common design and purpose. As Judge Karwacki noted in *McMillian v. State,* 325 Md. 272, 292, 600 A.2d 430 (1992):

The existence of a conspiracy can be established from circumstantial evidence from which an inference of common design may be drawn.

We hold that the evidence was sufficient to permit the inference that Frank Scarpola was acting in concert with Rose Mary Fisher and Mary Utley in abusing both Rita and Georgia Fisher. The head of the household was Mary Utley. Frank Scarpola was not related in any way to the two young Fisher girls, but Mary Utley delegated to Frank Scarpola a large measure of authority with respect to disciplining the two young girls.

With respect to the various forms taken by the child abuse, Georgia Fisher testified that both girls were the victims and that 1) her mother, 2) her older sister, and 3) Frank Scarpola all participated in pursuit of a common purpose. Part of her testimony referred to the regular beatings that would occur in the basement of the house:

Q: Can you tell the jury what would happen in the basement?

A: Frank and my sister and my mom would, used to beat us. Down in the basement.

Q: What was down in the basement?

A: A punching bag.

. . .

A: They would hit us, kick us, punch us.

Q: When you say they, who do you mean?

A: Frank, Rosie and my mom.

Another form taken by the abuse was the imprisonment of both girls in a small toilet room in the basement. They were frequently locked in for extended periods of time in what the two victimized sisters referred to as "the hole":

Q: Was there a place in the basement called the hole?

A: Yes.

Q: Can you tell the jury about the hole?

A: It was a small place that had a toilet and it had a stall and they locked us in there for punishment.

Q: It had a toilet and a stall?

A: Yeah.

Q: And they locked who in there?

A: Me and my sister.

Q: Which sister, honey?

A: Rita.

Q: Who locked you in the hole?

A: Frank, Rosie and my mom.

Q: How many times did Rosie lock you in the hole?

A: Lots of times.

Q: How about your mom?

A: Sometimes.

Q: How about Frank?

A: Every day.

When they were locked in "the hole," Georgia and Rita were frequently deprived of both food and drink for long periods of time. Occasionally when Mary Utley would bring some food or water to the children, Georgia could hear Frank Scarpola and Rose Mary Fisher admonishing each other and admonishing Mary Utley that the children should not be fed:

Q: Did you get anything to eat or drink when you were in the hole?

A: Sometimes.

Q: Who brought it?

A: My mother.

Q: When your mother brought you some food or some drink did you hear any conversation in the house?

A: Yes.

Q: What did you hear?

A: Frank and Rosie saying not to feed me and my sister.

At times, the two young victims would be locked in their bedroom. Approximately once an hour, they would be allowed out of the room and directed to go to the bathroom. If they could not perform, they were hit in the face. Once again, all three of the appellants were guilty of the abuse:

A: They would unlock the doors and let us go to the bathroom.

Q: Who would?

A: Frank, Rosie and my mom.

Q: Frank, Rosie and your mom. And how often were you allowed to use the bathroom?

A: Once every other—

Q: Once every other what?

A: Hour.

Q: Once every other hour. Would you be watched when you went to the bathroom?

A: Yes.

Q: What would happen if you couldn't go?

A: Be hit.

Q: And where would you be hit?

A: In the face.

Q: Who would hit you?

A: Frank, Rosie and my mom.

Shortly before Rita Fisher was killed, both girls were told that Frank Scarpola "didn't want us in the house any more." Both girls were threatened by all three of the appellants that they were going to be sent away to "some place" where they would remain "until we would be 20." Georgia Fisher testified in this regard:

Q: Did you talk to your mother or your sister about this going away, how you and Rita were going to have to go away?

. . .

A: They, all three told us that since we weren't behaving that they [would] run us to SSI.[?]

The conspiracy continued even after the death of Rita Fisher. All three appellants told Georgia to lie about what had happened to her sister:

Q: Did anybody say anything to you?

A: Yeah.

Q: What'd they say to you?

. . .

A: —to lie.

Q: To lie. Who told you to lie?

A: Frank, Rosie and my mom.

Georgia elaborated about her initial reluctance to tell the police about what had happened to Rita:

Q: The ambulance came. And did you tell them what had happened to you and Rita?

A: No.

Q: Why not?

A: So, because I was afraid.

Q: What made you afraid?

A: They, my mom, my sister and my sister's boyfriend told me if I said anything that they would hurt me.

. . .

Q: Did you ever talk to any police officers?

A: Yes.

Q: And at first when you were at headquarters did you tell them what had happened?

A: No.

Q: Why didn't you tell them what had happened?

A: Because my mom and Frank told me if I did they were going to hurt me.

There was, moreover, evidence of a meeting of the minds from Frank Scarpola's own testimony. When asked about the placing of the two little girls in the "hole," he replied, "That was a punishment that I agreed upon in discussion between myself, Rose, and Mary." With reference to tying Rita up with shoestrings the night before her death, he testified that "the restraints put on her wrists were on loosely by myself and by Rose's assistance."

In explaining one severe beating of Georgia as a punishment for stealing that "got out of hand," Scarpola implied that all three appellants had agreed to the punishment:

> That was during the time when everything got out of control the day she had stolen from the house. Normal punishments had been imposed. Normal punishments were not obeyed. *Everybody was extremely upset that day* she had stolen for a second time. We had even tried talking to a police officer.... The spanking that happened was because she had fallen and it got out of hand like I said.
>
> \* \* \*
>
> Q: That's a beating. That's severely beating, isn't it?
>
> A: I told you that she had fought.
>
> Q: That she had what?
>
> A: That she fought. She did not want to get a spanking.
>
> \* \* \*
>
> Q: ... Now, that was supposed to be just a normal spanking?
>
> A: *You have to remember everybody was upset and everybody was frustrated and everybody [was] extremely confused. Like I said, the spankings got out of hand.*
>
> Q: What did you use?
>
> A: What was used that day? I believe it was a belt.

(Emphasis supplied).

With respect to the initial cover-up of the cause of Rita's death, Scarpola acknowledged that the three appellants acted in concert:

Rose had stated she did not want to tell the truth because she was scared. To Mary I had stated that we will just tell them Rita fell down the stairs and that's the way it pretty much ended up.

According to Scarpola's testimony, the three appellants also agreed on attributing some of Rita's injuries to a suicide attempt:

Q: Yeah, and you said we need to explain all these other injuries. We need to explain these ligature marks. We can come up with a story that Rita tried to hang herself, right?

A: Yes.

Q: That was your idea?

A: I stated during the discussion that the only thing I could think of that would possibly explain the mark on the chest at that time because I did not understand why she got the mark because she was not tied the way I had left her or the way anybody else had left her, I said that the only possible way to do it was to be a mock suicide just like what her sister had done. I also stated that I did not think that this was going to work and I did not agree with it because she had already had the other ligature marks on her wrists and ankles. I had to go along with it because of how scared everybody was.

The brutal "disciplining," including the deprivation of food and water, which constituted the child abuse of both Rita Fisher and Georgia Fisher was clearly part of a common scheme and design participated in and consciously shared by Frank Scarpola, Rose Mary Fisher, and Mary Utley. Both conspiracy charges against Frank Scarpola were properly submitted to the jury.

**JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**